[Cite as *Maas v. Maas*, 2020-Ohio-5160.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH R. MAAS, Individually and Derivately on behalf of JTM Provisions Company, Inc., | : | APPEAL NO. C-190536<br>TRIAL NO. A-1705836 |
| | : | |
| Plaintiff-Appellee, | : | *O P I N I O N.* |
| | : | |
| vs. | : | |
| ANTHONY A. MAAS, | : | |
| JOHN T. MAAS, JR., | : | |
| JEROME T. MAAS, | : | |
| GREGORY J. SYKES, | : | |
| JOHN SULLIVAN, | : | |
| JAMES F. BERDING, | : | |
| and | : | |
| JTM PROVISIONS COMPANY, INC., | : | |
| Defendants-Appellees. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: November 4, 2020

*Stites & Harbison PLLC*, *William G. Geisen*, *Andrew J. Poltorak* and *Cassandra L. Welch*, for Plaintiff-Appellant,

*Vorys, Sater, Seymour and Peas LLP*, *Victor A. Walton, Jr.*, *Jacob D. Mahle* and *Jessica K. Baverman*, for Defendants-Appellees Anthony A. Maas, John T. Maas, Jr., and Jerome T. Maas,

*Frost Brown Todd LLC*, *Ali Razzaghi* and *Ryan W. Goellner*, for Defendants-Appellees Gregory J. Sykes, John Sullivan and James F. Berding,

*Santen & Hughes* and *Brian P. O'Connor*, for Defendant-Appellee JTM Provisions Company, Inc.

**WINKLER, Judge.**

{¶1} Plaintiff-appellant Joseph R. Maas ("Joe"), individually and derivatively on behalf of JTM Provisions Company, Inc., ("JTM") appeals the decision of the Hamilton County Court of Common Pleas granting summary judgment in favor of the officers, shareholders and directors of JTM on his claims for breach of fiduciary duty and minority-shareholder oppression. We find no merit in his three assignments of error, and we affirm the trial court's judgment.

### I. Facts and Procedure

{¶2} JTM is a closely held, family-owned, food-processing business based in Harrison, Ohio. It originated as a butcher shop and delicatessen operated by the shareholders' parents and has transformed into a business with a national presence. Currently, it is equally owned and controlled by Joe and his three brothers: defendants-appellees Anthony T. Maas ("Tony"), John T. Maas, Jr., ("Jack") and Jerome T. Maas ("Jerry") (collectively "the shareholders"). All four shareholders also sit on JTM's board of directors.

{¶3} Each of the four shareholders has played a role in JTM's growth from a small family enterprise to a national supplier of food products to restaurants, schools, and government entities. Tony is the president and chief executive officer of the company. Jack is the chairman of the board of directors and was involved in sales and marketing, although he has stepped away from those duties. Jerry is a vice-president and focused on business development and special projects. Until recently, Joe was also a vice-president and focused on facilities management.

{¶4} Defendants-appellees Gregory Sykes, James Berding, and John Sullivan are independent directors of JTM (collectively "outside directors"). All are

3

experienced businessmen and directors. They have been full voting members of the board of directors since 2013. JTM added the outside directors, who were not family members or employees, to bring differing perspectives and help ensure sound decision-making.

{¶5} Joe has long been at odds with his brothers, especially Tony, about the way the business is run. Woven through the complaint are Joe's various claims that Tony is domineering and controlling and forces out anyone who questions his demands. In Joe's view, Tony's volatile leadership style results in the board of directors consistently voting with Tony, leading to a six to one outcome, with Joe being the lone dissenting vote. Joe claims that the board lacks independence and that it acquiesces to Tony's demands.

{¶6} The other shareholders and the outside directors counter that Joe has brought forth a litany of meritless complaints about the way JTM is managed and that those complaints have increased in recent years. They claim that he has become relentlessly adversarial toward the company and his fellow directors.

{¶7} The outside directors' response is that they actively participate in board meetings, engage in discussion and debate, and ask questions. They gather information and build consensus before voting on a resolution. They also contend that each time Joe has complained, they have reviewed and investigated his complaints. The complaints were either found to be unproven or the board adopted corrective measures.

{¶8} On November 9, 2o17, Joe filed a complaint naming as defendants the company, the shareholders, and the outside directors. Count one was a direct claim for minority-shareholder oppression. Counts two through four were breach-of-fiduciary-duty claims. Joe's allegations involved three distinct matters: (1) JTM's

4

plant and freezer expansion; (2) excessive and self-serving charitable giving programs; and (3) self-dealing and gross mismanagement by Tony.

{¶9} The shareholders filed a motion to dismiss count one of Joe's complaint for minority-shareholder oppression. The trial court granted the motion because the allegations of the complaint did not demonstrate that Joe had suffered individual harm separate and distinct from any injury to the corporation. Nevertheless, the court dismissed count one of the complaint without prejudice. It stated that Joe could seek leave to amend his complaint, "but he must submit the type of facts that support a minority shareholder direct action."

{¶10} Over a year later, Joe filed a motion for leave to amend his complaint. His proposed amended complaint contained additional allegations in support of count one, which had previously been dismissed by the trial court. The court denied the motion stating that the amendment would be futile. It stated, "The facts in Plaintiff's proposed first amended complaint do not describe the kind of facts required for a minority suppression action. There are no unique facts that are distinct to Plaintiff but rather a complaint that alleges only facts that implicate the profitability of the corporation." The court later permitted Joe to file an amended complaint, with the caveat that count one had been dismissed.

{¶11} Subsequently, the other shareholders and the outside directors filed motions for summary judgment on the remaining counts of Joe's complaint. The trial court granted those motions. On September 5, 2019, the court journalized a final judgment entry granting judgment in favor of the defendants and dismissing the action with prejudice. This appeal followed.

## II. Breach of Fiduciary Duty

{¶12} Joe presents three assignments of error for our review. In his first assignment of error, he contends that the trial court erred in granting the shareholders' and outside directors' motions for summary judgment. He argues that material issues of fact existed for trial on his claims for breach of fiduciary duty, that the trial court disregarded his evidence, and that the trial court improperly applied the business-judgment rule. This assignment of error is not well taken.

### A. Standard of Review for Summary Judgment

{¶13} An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Chateau Estate Homes, LLC v. Fifth Third Bank*, 2017-Ohio-6985, 95 N.E.3d 693, ¶ 10 (1st Dist.). Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Chateau Estate Homes* at ¶ 10. The trial court has an absolute duty to consider all pleadings and evidentiary material when ruling on a motion for summary judgment. It should not grant summary judgment unless the entire record shows that summary judgment is appropriate. *Green v. Whiteside*, 181 Ohio App.3d 253, 2009-Ohio-741, 908 N.E.2d 975, ¶ 23 (1st Dist.).

{¶14} The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of any genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 282-293, 662 N.E.2d 264 (1996); *Taft,*

*Stettinius & Hollister, LLP v. Calabrese*, 2016-Ohio-4713, 69 N.E.3d 72, ¶ 10 (1st Dist.). Once the moving party has met its burden, the nonmoving party has a reciprocal burden to set forth specific evidentiary facts showing the existence of a genuine issue for trial. *Dresher* at 293; *Columbia Dev. Corp. v. Krohn*, 1st Dist. Hamilton No. C-130842, 2014-Ohio-5607, ¶ 17. The nonmoving party cannot rest on conclusory allegations or self-serving interpretations of the evidence presented. *Dresher* at 293; *Zang v. Cones*, 2015-Ohio-2530, 34 N.E.3d 955, ¶ 43 (1st Dist.).

{¶15} The mere existence of factual disputes between the parties does not necessarily preclude summary judgment. Only disputes over genuine factual matters that affect the outcome of the suit will properly preclude summary judgment. Factual disputes that are irrelevant should not stop the entry of judgment as a matter of law. *Smith v. A.B. Bonded Locksmith¸ Inc.*, 143 Ohio App.3d 321, 326, 757 N.E.2d 1232 (1st Dist.2001); *Thompson v. Eiler*, 1st Dist. Hamilton No. C-990634, 2000 WL 864444,*3 (June 30, 2000).

### B. Corporate Officers' Fiduciary Duties

{¶16} To maintain a claim for breach of a fiduciary duty, the plaintiff must prove (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury proximately resulting from that failure. *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988); *Troja v. Pleatman*, 2016-Ohio-7683, 65 N.E.3d 809, ¶ 8 (1st Dist.). Joe brought breach-of-fiduciary-duty claims against two distinct groups, the shareholders, who are also officers and directors of the corporation, and the outside directors.

{¶17} As to the officers of the corporation, R.C. 1701.641(B) provides,

An officer shall perform the officer's duties to the corporation in good faith, in a manner the officer reasonably believes to be in or not

7

opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. In performing an officer's duties, an officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, which are prepared or presented by any of the following:

(1) One or more directors, officers, or employees of the corporation who the officer reasonably believes are reliable and competent in the matters prepared or presented;

(2) Counsel, public accountants, or other persons as to matters that the officer reasonably believes are within the person's professional or expert competence.

These are the only fiduciary duties an officer owes a corporation unless the articles of incorporation, corporate regulations, or a separate written agreement establishes additional fiduciary duties. R.C. 1701.652(A); *Fields v. Bastech, Inc.*, S.D. Ohio No. 3:19-cv-135, 2020 WL 3173145, *8 (June 15, 2020). A plaintiff must prove a breach-of-fiduciary-duty-claim by clear and convincing evidence. R.C. 1701.641(C).

### C. Directors' Fiduciary Duties

{¶18} As to the directors, the fiduciary relationship between a corporation's directors and the corporation and its shareholders includes a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. *Zalvin v. Ayers*, 1st Dist. Hamilton No. C-190285, 2020-Ohio-4021, ¶ 15; *Wing Leasing, Inc. v M & B Aviation, Inc.*, 44 Ohio App.3d 178, 181, 542 N.E.2d 671 (10th Dist.1988). R.C. 1701.59(B) provides,

A director shall perform the director's duties as a director, including the duties as a member of any committee of the directors upon which the director may serve, in good faith, in a manner the director reasonably believes to be in or not opposed to the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances. A director serving on a committee of directors is acting as a director.

A director is entitled to rely on the same information as the officers with the addition that directors can also rely on a committee of directors on which the director does not serve "as to matters within its designated authority, which the director reasonably believes to merit confidence." R.C. 1701.59(C).

{¶19} Under Ohio law, the director of a close corporation owes these duties to both the corporation and its shareholders. *Vontz v. Miller*, 2016-Ohio-8477, 111 N.E.3d 452, ¶ 43 (1st Dist.). Because close-corporation directors are frequently the corporate stockholders, "courts tend to impose a stringent fiduciary duty standard on such directors*." Genesis Respiratory Servs., Inc. v. Hall*, 99 Ohio App.3d 23, 28, 649 N.E.2d 1266 (4th Dist.1994). The plaintiff must prove a breach-of-fiduciary-duty claim by clear and convincing evidence. R.C. 1701.59(D)(1); *Vontz* at ¶ 43.

### D. The Business-Judgment Rule

{¶20} Ohio courts adhere to the "business judgment rule." Under that rule, courts will not inquire into the wisdom of actions taken by the directors in the absence of fraud, bad faith, or abuse of discretion. *Koos v. Cent. Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 589, 641 N.E.2d 265 (8th Dist.1994). Directors are presumed to have acted in good faith and in the best interests of the corporation. *Vontz* at ¶ 44. "[D]irectors carry the burden of showing a transaction is fair only after the plaintiff

has made a prima facie case showing that the directors have acted in bad faith or without the requisite objectivity." *Vontz* at ¶ 44.

{**¶21**} The protection of the business-judgment rule can only be claimed by disinterested directors. *Gries Sports Ent., Inc. v. Cleveland Browns Football Co. Inc.,* 26 Ohio St.3d 15, 20, 496 N.E.2d 959 (1986); *Koos* at 590. "Disinterested directors" does not mean indifferent directors or directors with no stake in the outcome. *Koos* at 590. Disinterested directors are those who "neither appear on both sides of the transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit that devolves upon the corporation or all stockholders generally." *Gries* at 20. The decisions of disinterested directors will not be disturbed if they can be attributed to any rational business purpose. The burden is on the party challenging a decision to establish facts rebutting the presumption that the directors acted in good faith. *Id.*; *Koos* at 590.

{**¶22**} Joe's allegations fall into three categories: (1) allegations regarding plant expansion, specifically the new freezer, (2) allegations related to charitable giving, and (3) allegations related to Tony's alleged self-dealing and mismanagement. We address each of these categories in turn.

### E. The Plant and Freezer Expansion

{**¶23**} In 2015 and 2016, JTM's board saw a need to increase its manufacturing capacity, and it began to plan the expansion of JTM's processing facility with the construction of a new plant and freezer. At a contentious October 22, 2015 meeting of the board of directors, the board discussed a proposal to perform an engineering site analysis of ways to satisfy JTM's long-range needs, including a new industrial freezer. The initial proposal was to analyze the costs and benefits of a

new freezer, but the board also wanted to analyze the integration of the freezer with a possible new plant, depending on the company's needs.

{¶24} Joe had led previous construction projects for the company, so the board expected that he would do the same with the expansion project, but he refused. Consequently, the board agreed that Jerry would oversee hiring an engineer for the project. Jerry formed a team of JTM management and employees to lead the project.

{¶25} After investigating various firms, the expansion team invited the Tippman Group to present its analysis of a possible plant expansion to the board. At the February 2016 board meeting, Jerry reported that the project's goal was to develop a master plan for the expansion. In April 2016, Tippman's representative returned to the board to present a proposed site plan that included a new plant, and the directors provided input on the plan.

{¶26} In May 2016, Sykes met with the shareholders to discuss expansion options. The shareholders agreed that JTM needed more freezer space and expanded manufacturing capacity but disagreed on how to remedy the problem. A detailed summary of the meeting contained an analysis of three proposals for the expansion, including Joe's proposal to modify existing facilities.

{¶27} A month later, at the June 23, 2016 board meeting, JTM's shareholders voted three to one to approve a contract with Tippman to build a new freezer. Joe was the sole dissenting vote. At the board's August 18, 2016 meeting, the board heard presentations for expanding JTM's capacity. Tony and Jerry's presentation involved constructing a new plant. Joe's presentation involved modifying existing facilities. The board voted six to one to build the new plant, with Joe as the lOne dissenter.

11

{¶28} The next day, Sykes called Jack to try to get Joe on board with building the new plant, but Jack was not able to do so. After another shareholder meeting about the expansion, the board met by phone on August 29, 2016, and again voted six to one to build the new plant as proposed at the August 18 meeting.

{¶29} In support of Joe's claim for breach of fiduciary duties, he relies upon decisions that are not in accord with JTM's stated strategic plan. Joe contends that the plant-expansion plan was reckless and failed to consider the strategic plan. In 2013, the shareholders had agreed that JTM should emphasize profitability over revenue and that they would develop their profitability targets and devise plans for achieving those goals within a long-term strategic plan. Under the 2015-2018 plan, JTM was to achieve increasing profit levels each year. JTM repeatedly fell short of those goals.

{¶30} Within two months of adopting the 2015-2018 plan, which purposely did not provide for any significant capital improvements, Tony requested that the capital-budget committee evaluate increasing capacity and secure quotes for a new freezer addition. At Tony's request, the committee, consisting of Joe, Jack, Jerry, and two high-level employees, considered the necessity of the desired improvements at its October 21, 2015 meeting.

{¶31} The committee decided to defer any further action regarding the freezer because there was no immediate need to proceed with developing a new freezer or increase capacity to justify deviating from the strategic plan. It decided that it would not proceed with a design and capital budget related to the freezer until at least 2017.

{¶32} The following day, at the October 22, 2015 board meeting, Joe reported the capital-budget committee's recommendations, which Tony refused to

12

accept. According to Joe, Tony physically attacked him and challenged him to a fist fight, though the other directors did not remember Tony attacking Joe. Joe claimed that the board agreed to perform a cost-benefit analysis on constructing a new freezer to calm Tony's tirade. If it was established that a new freezer was needed, JTM would engage a site engineer to do a site analysis of JTM's property.

{¶33} Joe contends that the other shareholders, along with Sullivan, proceeded with soliciting proposals from various contractors without approval from the board and without a prior cost-benefit analysis or a site study. He further contends that Tony withheld a cost-benefit analysis from the board because it was unfavorable. Instead, Tony presented an analysis he had performed because it was favorable. JTM never received a site analysis from a site engineer as directed at the October 22, 2015 meeting. Further, the board decided to hire Blentech, an equipment manufacturer, to design the production line at the new plant, even though it had no experience with that type of project.

{¶34} Joe relies heavily on the deviations from the board's 2015-2018 strategic plan which specifically did not provide for significant capital improvements, and the recommendations of the capital-budget committee. However, the board was neither bound by the strategic plan nor the committee's recommendations. Joe admitted that the board had the authority to change the strategic plan.

{¶35} The failure to meet short-term profitability goals does not rise to the level of a breach of fiduciary duty. R.C. 1701.59(F)(4) specifically allows the board to consider "[t]he long-term as well as the short-term interests of the corporation and its shareholders." The shareholders agreed that JTM required more freezer space, and to expand its manufacturing capacity. Joe just disagreed with how it should be done.

13

{¶36} Further, the record shows that the board did not just accept Tony's recommendation. It engaged in due diligence and performed analyses of the proposed expansion project. Further, the board did not arbitrarily strip Joe of his responsibilities. Joe refused to lead the project, so his brother Jerry was chosen to lead the team that completed the project. The team was comprised of experienced professionals at JTM with Jerry overseeing the project and team.

{¶37} The board had valid reasons for proceeding with construction of the freezer, even if in hindsight, it did not always go as well as planned. "[T]he business judgment rule recognizes that many important decisions are made under circumstances of uncertainty, and it prevents courts from imposing liability on the basis of ex post facto judicial hindsight * * *." *Koos*, 94 Ohio App.3d at 589, 641 N.E.2d 265, quoting *Radol v. Thomas*, 772 F.2d 244, 256 (6th Cir.1985).

{¶38} The board's decisions fell squarely within the business-judgment rule. Most of Joe's "evidence" consisted of his own opinions and conclusions. He has failed to make a prima facie case that the directors acted in bad faith or without the requisite objectivity in dealing with the plant expansion.

### F. Charitable Giving

{¶39} JTM has historically had a generous commitment to charitable giving, which was modeled on the shareholders' parents long standing practice of charitable giving. Their parents had tithed ten percent of their income, so JTM in recognition of its founder's generosity, donated ten percent of its pre-tax net profits to charity, with nine percent allocated to cash and one percent in kind. Through the years, all the shareholders had agreed to continue the ten-percent level of charitable giving.

{¶40} In November 2016, Joe formally objected to the ten-percent level of giving, based on his concerns about profitability. In response, the board passed a

14

resolution regarding charitable giving at its February 9, 2017 meeting. The resolution reduced and capped charitable giving, whether in cash or in kind, at two percent of JTM's pre-tax net income, with a couple of exceptions, and further stated that JTM would donate no more than $500,000 to $525,000 annually. The resolution also allowed each of the four brothers to direct 25 percent of the company's charitable contributions. The resolution further required the company's chief financial officer to submit a written report on a quarterly basis outlining the level of company donations.

{¶41} According to Joe, the board failed to enforce the policy, and JTM has given more than two percent of its pre-tax income to charity. The record shows that JTM gives to charity throughout the year based on forecasted net income, and that, at times, charitable contributions were over the two percent limit once actual net income was calculated.

{¶42} After the board learned of an overage in 2017, it passed another resolution that required the brothers to reimburse JTM proportionally so that not more than two percent of JTM's pre-tax income would go to charity. It also required JTM to hold back some of its projected fourth-quarter charitable contributions in recognition of the fluctuating and unknown nature of pre-tax income. All the brothers, with the lone exception of Joe, complied with the reimbursement requirement.

{¶43} Thus, the record shows that the board complied with Joe's request regarding changes to JTM's charitable contributions. But even if it had not, JTM's charitable giving would still fall within the purview of the business-judgment rule. The record clearly shows that charitable giving is an important part of JTM's mission. R.C. 1701.13(D) specifically provides that a corporation "may make

donations for the public welfare or for charitable, scientific, or educational purposes." The trial court stated that "[e]ven at the 10% rate, the directors' and officers' commitment to charitable giving is not a breach of fiduciary duty." We agree. JTM's charitable contributions were not exceptionally high and did not lead to the conclusion that corporate assets were being wasted or misused. *See Sobin v. Lim*, 2014-Ohio-4935, 21 N.E.3d 344, ¶ 27 (8th Dist.).

### G. Self-Dealing and Mismanagement

{¶44} Finally, Joe contends that Tony engaged in numerous instances of self-dealing and mismanagement, and that the directors failed to implement internal controls. According to Joe, Tony misused the company credit cards, misused travel and entertainment expenses, and hired friends in violation of the board's policies.

{¶45} A director has a duty to refrain from self-dealing. Directors must perform their duties in a manner that they reasonably believe to be in or not opposed to the corporation's best interest. *Vontz*, 2016-Ohio-8477, 111 N.E.3d 452, at ¶ 42; *Koos*, 94 Ohio App.3d at 589, 641 N.E.2d 265. If a director is not disinterested or has engaged in self-dealing, the decision is not void but will be closely scrutinized. In that case, the director will be required to show that the transaction was fair and reasonable to the corporation notwithstanding the director's personal interest. *Koos* at 590. Further, even if a director is not disinterested, a disinterested majority of the shareholders may ratify the director's actions "provided there is no actual fraud in either inducing or effecting the ratification." *Id.*, quoting *Claman v. Robertston*, 164 Ohio St. 61, 128 N.E.2d 429 (1955), paragraph one of the syllabus.

{¶46} Joe alleges that Tony diverted hundreds of thousands of dollars to himself through a fictitious entity called Triple A Incentives. Tony used the company to pay himself an extra $3,000 a month from 2003 to 2010. Tony claimed it was for

advertising work he performed for JTM, and that an advertising agency receives a ten to 15 percent commission. No one was aware that Tony had created this company or that he was paying himself.

{¶47} When Joe first raised the issue in August 2018, the audit committee referred the issue to corporate counsel to investigate. Counsel discovered that the board had already addressed the issue in 2010. The board asked Tony to stop the payments, which he did, although it did not ask him to repay the money. Counsel recommended that the board not reopen the matter. After deliberating, the audit committee accepted that recommendation. Thus, while these payments are concerning, the board ratified the action. *See* R.C. 1701.60(A); *Koos* at 290; *Antioch Litigation Trust v. McDermott Will & Emery, LLP*, 738 F.Supp.2d 758, 766 (S.D.Ohio 2010).

{¶48} Moreover, the trial court properly determined that any claim related to those payments was barred by the statute of limitations. The four-year statute of limitations set forth in R.C. 2305.09(D) applies to causes of action for breach of fiduciary duty. *Chateau Estate Homes, LLC*, 2017-Ohio-6985, 95 N.E.3d 693, at ¶ 12; *Wells v. C.J. Mahan Constr. Co.*, 10th Dist. Franklin Nos. 05AP-180 and 05AP-183, 2006-Ohio-1831, ¶ 26. Further, the discovery rule does not apply to breach-of-fiduciary-duty claims not based on fraud. *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 182, 546 N.E.2d 206 (1989); *Wells* at ¶ 28.

{¶49} Joe's claims concerning those payments were premised upon self-dealing, not fraud. *See Investors REIT One* at 182. While Joe's other complaints involved issues that were ongoing, "[t]he salient facts of self-dealing were known in 2010," as stated by the trial court. Therefore, Joe's argument that he did not discover the fact until 2018 is irrelevant.

17

**{¶50}** Joe further contended that Tony used JTM funds to purchase multiple $100,000 vouchers from Delta Airlines. He used the vouchers to take trips with his wife and children, while charging the expenses to JTM. The vouchers also permitted Tony to maintain his Medallion Member status with Delta. But those alleged personal trips were family charter retreats. Those retreats were reviewed by JTM's chief financial officer and accounting firm, which validated them as legitimate business expenses.

**{¶51}** Joe further alleged that Tony, Jerry, and others had used their corporate credit cards to pay for personal expenses, and that an independent auditor had flagged JTM's credit card procedures as inadequate. Under JTM's procedure, any charges made to a corporate credit card held by a shareholder were charged directly against the shareholder's draw, unless the shareholder provided supporting documentation to demonstrate that a charge was a reimbursable business expense. After Joe's complaint, the board reviewed JTM's officers' and directors' credit-card use. It decided to enact further controls and to provide additional oversight.

**{¶52}** Joe also found fault with Tony's pledge of $500,000 to the University of Cincinnati for the renovation of its basketball arena without prior board approval. That commitment violated JTM's policy that expenditures more than $100,000 must be approved by the board of directors. But the commitment to the university required JTM to spend just $50,000 during any one year.

**{¶53}** Nevertheless, based on Joe's complaint that the commitment violated JTM's policy, the audit committee referred the issue to corporate counsel. Counsel determined that the expenditures were within the ordinary course of business, but still recommended that the board review annual entertainment spending as part of

its budget review. The audit counsel agreed and passed that recommendation onto the board.

{¶54} Another of Joe's contentions is that in October 2017, Tony, along with Sykes, began to explore a way to acquire a business venture, Maka Mia Pizza, ("Maka Mia") for the benefit of Tony's son despite the fact that the board had determined two years before to disassociate itself from Maka Mia due to one of JTM's largest customers objecting to the relationship. Exploration of the acquisition ended when Sykes learned that Jack and the salesforce opposed the deal. Nevertheless, Tony negotiated the acquisition of Maka Mia for his son and personally guaranteed the funding.

{¶55} The record shows that Maka Mia invented a pizza oven that could cook pizzas very quickly, making it ideal for convenience stores and truck stops. JTM was involved in the build-up of the Maka Mia brand and supplied it pizza sauce, pizza crusts and other related items. Tony's son Matt was employed by JTM at the time, but also worked with Maka Mia. Tony wanted to buy Maka Mia, but the board declined to do so because an important customer of JTM objected. Matt signed a promissory note to purchase Maka Mia, which Tony personally guaranteed. After that, Matt was no longer employed by JTM.

{¶56} Nothing related to Maka Mia shows self-dealing by Tony. It was a successful business that JTM could rationally have justified purchasing, which means the decision to pursue the purchase fell under the business-judgment rule. But JTM made the decision not to invest in Maka Mia, and therefore, Tony did not usurp an opportunity which rightfully belonged to JTM. The fact that Tony's son ultimately purchased the business and Tony personally guaranteed the note does not somehow make the purchase of Maka Mia self-dealing.

19

**{¶57}** Joe also contends that the board allowed Tony to repeatedly violate JTM's affirmative action program, which jeopardized JTM's government contracts. He claims that Tony directed JTM's former talent acquisition and equal-opportunity manager, to hire a prospective employee without conducting other interviews. The manager raised concerns with her supervisor, who told her to go ahead and hire the employee.

**{¶58}** The manager believed that hiring that eventual employee violated JTM's policies, which were designed to comply with Equal Opportunity Commission regulations. She stated that Tony had asked her to send a letter stating that the company did not violate its affirmative action program with that hire. She told him that she would not do it, because the hire did violate that policy. Joe concluded that "Defendants have acted in bad faith and in reckless disregard for the best interest of JTM by failing to provide oversight and failing to take action to correct violations of JTM's policies, including, without limitation, the human resources policies."

**{¶59}** But the record shows when Joe complained, the audit committee referred the issue to corporate counsel, who investigated and recommended that the audit committee review JTM's hiring policies with relevant personnel. Thus, the directors did take action to correct the violation of JTM's hiring policies.

**{¶60}** Joe has "cited no authorities recognizing a separate claim under Ohio law for breach of fiduciary duties arising from violations of internal corporate policies." *See Brosz v. Fishman*, 99 F.Supp.3d 776, 788 (S.D.Ohio 2015). Further, nothing in the record shows that the policy was violated, or that JTM suffered any repercussions. Damage is an essential element of a breach-of-fiduciary-duty claim. *Id.*, citing *Newcomer v. Natl. City Bank*, 2014-Ohio-3619, 19 N.E.3d. 492, ¶ 76 (6th Dist.). "Ohio law requires proof of damages to the corporation before a shareholder's

derivative action can be maintained." *Brosz* at 788, quoting *Brown v. Ferro Corp.*, 763 F.2d 798, 802-803 (6th Cir.1985).

{¶61} As to Joe's claims that the board failed to implement internal controls, the record shows that the board had internal controls. Joe's claims that the outside directors were afraid of or controlled by Tony are not supported by the record. The outside directors all had substantial business backgrounds. They did not vote against Tony, as Joe contends, but it does not necessarily follow that the board always did exactly what Tony wanted. The board's decisions were based on proper study and analysis and votes generally did not occur until some consensus had been formed.

{¶62} The record shows that between 2012 and 2014, JTM engaged various outside consultants to aid in the management of the company. Joe contends that each of these consultants independently reached the same conclusion: all four shareholders needed to step down from their day-to-day management of the company and hire outside professionals to run the business. On November 9, 2017, Joe formally presented a proposed resolution to the board to that effect. The resolution failed six to one.

{¶63} Joe also contends that the board ignored the recommendations of the outside consultants and sought to maintain the status quo. The record shows that the board considered the recommendations of the consultants and implemented some of their recommended actions. But the board simply did not agree with some of the recommendations and chose not to implement them.

{¶64} Further, the minutes of the meeting where Joe presented his resolution showed that the outside directors did not believe that removing the owners from the business would be beneficial and that such a huge transition would

21

be impractical. They preferred the company's approach of continuing to hire outside individuals with strong professional backgrounds.

{¶65} Even if the internal controls were not ideal, ideal standards are not required. As the court stated in *Brehm v. Eisner*, 746 A.2d 244, 256 (Del.2000),

All good corporate governance practices include compliance with statutory law and case law establishing fiduciary duties. But the law of corporate fiduciary duties and remedies for violation of those duties are distinct from the aspirational goals of ideal corporate governance practices. Aspirational ideals of good corporate governance practices for boards of directors that go beyond the minimal legal requirements of the corporation law are highly desirable, often tend to benefit stockholders, sometimes reduce litigation, and can usually help directors avoid liability. But they are not required by the corporation law and do not define standards of liability.

{¶66} In sum, the trial court did not improperly apply the business-judgment rule. Further, it did not ignore Joe's evidence or improperly weigh the credibility of the evidence. The various decisions of the board of directors about which Joe complains fell well within the business-judgment rule. Joe did not meet his reciprocal burden to show that genuine issues of fact existed for trial. At most, he showed that he did not agree with the board's decisions. But a difference of opinion does not rise to the level of a breach of fiduciary duty. Joe failed to show by clear and convincing evidence that the conduct of JTM's officers and directors rose to the level of a breach of fiduciary duty. Consequently, we overrule Joe's first assignment of error.

22

### III. Direct Claim for Minority-Shareholder Oppression

{¶67} In his second assignment of error, Joe contends that the trial court erred in dismissing his direct claim for minority-shareholder oppression. He argues that the pleadings demonstrate that the majority shareholders use their control to deprive minority shareholders of the benefit of their investment. This assignment of error is not well taken.

### A. Standard of Review for a Motion to Dismiss

{¶68} A Civ.R. 12(B)(6) motion to dismiss tests the sufficiency of the complaint. In ruling on such a motion, the trial court must take all the allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988); *Evans v. Thrasher*, 1st Dist. Hamilton No. C-120783, 2013-Ohio-4776, ¶ 13. A court may dismiss a complaint on a Civ.R. 12(B)(6) motion only when the plaintiff can prove no set of facts that would entitle the plaintiff to relief. O'*Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus; *Evans* at ¶ 13. The court should not rely on evidence outside of the pleadings, but it may consider materials that are referred to or incorporated into the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992); *Evans* at ¶ 13.

{¶69} While the factual allegations of the complaint are taken as true, "[u]nsupported conclusions of a complaint are not considered admitted" and are "not sufficient to withstand a motion to dismiss." *State ex rel. Hickman v. Capots*, 45 Ohio St.3d 324, 324, 544 N.E.2d 639 (1989); *Richardson v. Clinical Computing P.L.C.*, 2016-Ohio-8065, 69 N.E.3d 754, ¶ 38 (1st Dist.). Since factual allegations in the complaint are presumed true, only legal issues are presented. Therefore, we

review the granting of a Civ.R. 12(B) motion to dismiss de novo. *Richardson* at ¶ 26; *NCS Healthcare, Inc. v. Candlewood Partners, LLC*, 160 Ohio App.3d 421, 2005-Ohio-1669, 827 N.E.2d 797, ¶ 19 (8th Dist.).

### B. Majority Shareholders' Fiduciary Duties

**{¶70}** In a close corporation, majority shareholders owe a heightened fiduciary duty to minority shareholders to protect against abuse and oppression of minority shareholders. *Crosby v. Beam*, 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989); *Vontz*, 2016-Ohio-8477, 111 N.E.3d 452, at ¶ 31; *Miller v. McCann*, 1st Dist. Hamilton No. C-970035, 1997 WL 789394, *2 (Dec. 26, 1997). This duty prohibits majority shareholders from preventing minority shareholders from having an equal opportunity in the corporation and granting themselves benefits that are not shared by the minority. *Crosby* at 109; *Miller* at *2. This abuse or oppression includes a "squeeze-out" or "freeze-out" meaning the "manipulative use of corporate control to eliminate minority shareholders, or to reduce their share of voting power or percentage of ownership assets, or otherwise deprive them of advantages or opportunities to which they are entitled." *Vontz* at ¶ 31, quoting *Estate of Schoer v. Stamco Supply, Inc.*, 19 Ohio App.3d 34, 38, 482 N.E.2d 975 (1st Dist.1984).

### C. Direct v. Derivative Claim

**{¶71}** A shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim. *Crosby* at 107. Civ.R. 23.1 sets forth several requirements for maintaining a shareholders' derivative action. *Weston v. Weston Paper and Mfg. Co.*, 74 Ohio St.3d 377, 379, 658 N.E.2d 1058 (1996). Claims for a breach of fiduciary duty brought by a minority shareholder against majority shareholders, who use their control to deprive minority shareholders of the benefits of their investment, may be brought as individual or direct actions that are

not subject to the provisions of Civ.R. 23.1. *Crosby* at paragraph three of the syllabus.

{¶72} In contrast to a derivative action, in which the injury directly affects the corporation and only indirectly affects the shareholders, a direct action against a corporation requires an injury directly to the complaining shareholder. *Crosby*, 47 Ohio St.3d at 109, 548 N.E.2d 217; *Miller* at *2. The injury to the shareholder must be separate and distinct from the injury to the corporation. *Weston* at 379; *Crosby* at 107. "A plaintiff-shareholder does not have an independent cause of action where there is no showing that he has been injured in any capacity other than in common with all other shareholders as a consequence of the wrongful actions of a third party directed toward the corporation." *Adair v. Wozniak*, 23 Ohio St.3d 174, 492 N.E.2d 426 (1986), syllabus.

{¶73} The difference in the nature of the injury is reflected in the manner of recovery. In a shareholder's derivative suit, any recovery accrues to the corporation. "Where the defendant's wrongdoing has caused direct damage to corporate worth, the cause of action accrues to the corporation, not to the shareholders." *Adair* at 178. In a direct action, the complaining shareholder is directly compensated to prevent the wrongdoers from being the principal beneficiaries of the damages. *Crosby* at 109; *Miller* at *2. The court must determine whether a complaint states a derivative claim or a direct claim by looking to the nature of the alleged wrong rather than the designation used by the plaintiffs. *Sayyah v. O'Farrell*, 12th Dist. Brown No. CA2000-06-017, 2001 WL 433789, *4 (Apr. 30, 2001).

{¶74} Joe contends that direct claims are not limited to situations where the minority shareholder has suffered a direct injury. Citing *Crosby*, he argues that "the operative inquiry when determining whether a complaint properly alleges a direct

25

cause of action is whether the majority or controlling shareholders have used 'their control in a way that deprives the minority shareholder of the benefit of his investment.' "

{¶75} But he takes this statement out of context. The court actually stated in paragraph three of the syllabus,

> Claims of breach of fiduciary duty alleged by minority shareholders against shareholders who control a majority of shares in a close corporation, and use their control to deprive minority shareholders of the benefits of their investment, may be brought as individual, or direct actions and are not subject to the provisions of Civ.R. 23.1.

{¶76} In the body of the opinion the court stated, "The complaint before us, in essence, alleges that the majority shareholders acted both separately and collectively to exclude the appellees from the corporation's profit." *Crosby*, 47 Ohio St.3d at 110, 548 N.E.2d 217. The court then went on to analyze whether the various counts of the complaint were derivative or direct in nature. *Crosby* does not say what Joe claims and does not vitiate the need for a separate and distinct injury to the minority shareholder. Ohio law is clear that a separate injury is necessary for a direct claim.

{¶77} As explained in *Adair*, harm to the corporation does secondary harm to the shareholders.

> When the defendant's wrongdoing has caused direct damage to the corporate worth, the cause of action accrues to corporation, not the shareholders, even though in an economic sense real harm may well be sustained by the shareholders as a result of reduced earnings, diminution in the value of ownership, or accumulation of personal

26

debt and liabilities from the company's financial decline. The personal loss and liability sustained by the shareholder is both duplicative and indirect to the corporation's right of action.

*Adair*, 23 Ohio St.3d at 178, 492 N.E.2d 426.

### D. Joe's First Complaint

{¶78} In his first complaint, Joe alleged harm to the corporation generally and not separate harm to him. Allegations related to Tony's self-dealing and mismanagement, the reduced profitability of the corporation due to the plant expansion and charitable giving all describe harm to the corporation, not harm unique to Joe. *See Sayyah*, 12th Dist. Brown No. CA2000-06-017, 2001 WL 433789, at *4-5; *Antioch Baptist Church of Canton v. Jordan*, 5th Dist. Stark No. 1998CA00258, 1999 WL 333335, *2 (May 10, 1999). To the extent that defendants are liable for the loss of corporate assets, the liability runs to the corporation and not its individual shareholders. *See Adair* at 177.

{¶79} The only allegation that comes close to showing separate harm was an allegation that the board, dominated by the controlling shareholders, removed him from his position as vice-president of engineering, a position he held for decades. But, as the trial court pointed out, he alleged no facts showing that he suffered a loss of salary, a reduction in dividends, or a loss of benefits that were unique to him.

{¶80} Moreover, we need to look at the nature of the alleged wrong, rather than Joe's characterization of that harm. *See Sayyah* at *4. Joe's entire complaint was for breach of fiduciary duties by the shareholders and the outside directors. "[A]ctions for breach of fiduciary duty [by directors or officers] are generally to be brought in derivative suits." *Id.* at *3; *Grand Council of Ohio v. Owens*, 86 Ohio App.3d 215, 220, 620 N.E.2d 234 (10th Dist.1993). Primarily, the right to maintain

27

an action to recover for the alleged negligence, fraud, or misconduct of directors and officers, resulting in the depletion of corporation property, belongs to the corporation itself. *Sayyah* at *3; *Grand Council* at 220-221.

{¶81} Thus, since Joe did not allege any distinct harm, the trial court did not err in granting the motion to dismiss his direct claim for minority-shareholder oppression. Therefore, we overrule his second assignment of error.

### IV. Amendment of the Complaint

{¶82} In his third assignment of error, Joe contends that the trial court erred in denying his motion for leave to amend his complaint. He argues that the trial court improperly found that the amendment would be futile. This assignment of error is not well taken.

{¶83} The trial court dismissed the first count of the complaint without prejudice. It stated, "Plaintiff may seek to amend his Complaint, but he must submit the type of facts that support a minority shareholder direct action." Joe filed a motion for leave to amend his complaint, which the trial court denied.

{¶84} Civ.R. 15(A) governs the amendment of pleadings, and it provides that the court should freely give leave to amend "when justice so requires." *Isco Industries, Inc. v. Great Am. Ins.*, 1st Dist. Hamilton No. C-180636, 2019-Ohio-4852, ¶ 52; *Hensley v. Durrani*, 1st Dist. Hamilton No. C-130005, 2013-Ohio-4711, ¶ 14. The decision to grant or deny a motion for leave to amend lies within the discretion of the trial court. *Wilmington Steel Prods., Inc. v. Cleveland Elec. Illuminating*, 60 Ohio St.3d 120, 122, 573 N.E.2d 622 (1991); *Danopulos v. Am. Trading II, LLC*, 2016-Ohio-5014, 69 N.E.3d 157, ¶ 15 (1st Dist.).

{¶85} In ruling on a motion to amend, the trial court should consider several factors including whether the movant made a prima facie showing of support for the

28

new matters sought to be pleaded, the timeliness of the motion, and whether the proposed amendment would prejudice the opposing party. *Danopulos* at ¶ 24. A trial court properly refuses to grant leave to amend when amendment would be futile. *Isco Industries* at ¶ 52; *Hensley* at ¶ 14. The trial court found that count one of the amended complaint suffered from the same defects as the original complaint and that amendment of the complaint would be futile.

{¶86} In the amended complaint, Joe alleged that Tony directed that JTM's weekly and daily production information be withheld from Joe; that under the direction of the controlling shareholders, the board determined that Tony would earn $90,000 more in annual salary than Joe, in violation of JTM's decades-long policy that the four brothers would earn the same salary; that the board had voted to remove him as vice-president of engineering; that the board had voted to remove him as the chief safety officer, a position he had held for decades; that the board's resolution on charitable giving forced him to form, finance, and fund a private charitable foundation against his will; and that under the resolution he has been forced to reimburse JTM for his portion of the overage of JTM's charitable contributions against his will. These, he claims, are individual harms.

{¶87} But they are simply recitations of his claims for breach of fiduciary duties by the officers and directors of the corporation, which belong to the corporation itself and should be brought as a derivative claim. Again, Joe does not allege any reduction in his salary, benefits or dividends that were not shared by the other shareholders. Basically, Joe alleges a series of decisions with which he disagrees. He does not approve of the manner in which Tony runs the company, but the other members of the board find no fault with Tony's methods.

**{¶88}** The fiduciary duties owed by majority shareholders to minority shareholders do not mean that minority shareholders can frustrate the will of the majority by disagreeing over the course of the corporate action. *Koos*, 94 Ohio App.3d at 588, 641 N.E.2d 265. The majority shareholders have the right "to exercise control over the corporate affairs to which ownership of their shares entitle[s] them." *Id.* at 588-589, quoting *Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 402, 513 N.E.2d 776 (1987). "When a person acquires shares in a corporation, he comes in to be ruled by the majority in interest, and as long as such majority acts within the scope of the powers conferred by the corporation, the voice of the majority is the voice of the corporation and all of the shareholders." *Koos* at 588.

**{¶89}** The trial court's decision denying Joe's motion to amend his complaint was not so arbitrary, unreasonable, or unconscionable as to connote an abuse of discretion. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218, 450 N.E.2d 1140 (1983); *Cincinnati v. Harrison*, 1st Dist. Hamilton No. C-090702, 2010-Ohio-3430, ¶ 7. Therefore, we overrule Joe's third assignment of error.

### V. JTM's Assignment of Error

**{¶90}** JTM refers to itself as a "cross-appellant," and has filed an assignment of error even though it did not properly file a cross-appeal. Nevertheless, App.R. 3(C)(2) provides that a cross-appeal is not required where an appellee seeks to defend a trial court's judgment on a ground other than that relied on by the trial court but does not seek to the change the judgment or order. *McCarthy v. Sterling Chem., Inc.*, 1st Dist. Hamilton Nos. C-110805 and C-110852, 2012-Ohio-5211, ¶ 9. Despite Joe's arguments to the contrary, JTM's assignment of error is a proper assignment of error to prevent reversal because it does not seek to change the court's

judgment. But we need not address its assignment of error, because we are affirming the trial court's judgment. *See Estate of Hand*, 2016-Ohio-7437, 73 N.E.3d 880, ¶ 42 (12th Dist.).

### *VI. Summary*

{¶91} In sum, we hold that (1) the trial court did not err in granting the shareholders' and outside directors' motions for summary judgment concerning Joe's claims for breach of fiduciary duty; (2) the trial court did not err in granting the shareholders' motion to dismiss count one of the complaint, which was Joe's direct claim for minority-shareholder oppression; and (3) the trial court did not err in denying Joe's motion to amend count one of his complaint. Accordingly, we overrule his three assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**MOCK, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its own entry this date.