[Cite as *Hiznay v. Boardman Twp.*, 2017-Ohio-1212.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| WILLIAM HIZNAY | ) | |
| | ) | |
| PLAINTIFF-APPELLANT | ) | |
| | ) | CASE NO. 15 MA 0122 |
| VS. | ) | |
| | ) | OPINION |
| BOARDMAN TOWNSHIP | ) | |
| | ) | |
| DEFENDANT-APPELLEE | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
Pleas of Mahoning County, Ohio
Case No. 2014 CV 02949

JUDGMENT:                                      Affirmed.

APPEARANCES:
For Plaintiff-Appellant                   Attorney Joshua Hiznay
1040 South Commons Place, Suite 202
Youngstown, Ohio 44514

For Defendant-Appellee                 Attorney Matthew Vansuch
6550 Seville Drive, Suite B
Canfield, Ohio 44406

JUDGES:

Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: March 29, 2017

DeGENARO, J.

{¶1} Plaintiff-Appellant, William Hiznay, appeals the trial court's judgment upholding Boardman Township's rental property registration program as imposing a lawful fee rather than imposing a tax. As the Township's Resolution was proper, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶2} Hiznay is the owner of a two-family residential rental unit in Boardman Township. On November 10, 2014, the Board of Trustees adopted Resolution 14-01 titled "Enacting a codified home rule resolution for Boardman Township regarding landlord registration and rental unit standards." Hiznay filed a complaint for declaratory judgment asking that the Resolution be declared illegal.

{¶3} Two months after Hiznay filed his complaint, the Trustees adopted Resolution 15-01 titled "Amending Home Rule Resolution 14-01 for Boardman Township regarding landlord registration and rental unit maintenance standards." This Resolution amended parts of 14-01, but still required owners of rental units in the Township to register their units and pay an annual fee. The Resolution also authorized inspections and required that rental units conform to certain building standards. The following evidence was adduced at a bench trial, as recounted in the trial court's findings of facts:

{¶4} Boardman is the twelfth largest township in Ohio with a population over 40,000. It is nearly fully developed, with a mix of residential and commercial areas. More than two-thirds of the residential properties were built between 1940 and 1980. Of the 19,000 dwelling units in the Township, between 4,000 and 5,000 are not owner-occupied. Of those units nearly 40% are owned by entities or individuals living outside Boardman.

{¶5} In some neighborhoods in the northern section of the Township, 95% of the residences were built before 1980. Several of these neighborhoods have seen single-family, owner occupied residences being converted to duplexes and multi-family units. Further, in the course of enforcing its exterior maintenance code, building inspectors have discerned a pattern that problem properties are those where

the owner cannot be found or is out of state with no local contact. Moreover, every house the Township had recently demolished for being a nuisance and unfit for human habitation was the result of interior conditions—mold, deterioration from extensive water damage and excessive accumulation of trash—that caused the houses to be condemned. Accordingly, the Township began tracking complaints and discovered that most issues were from neighborhoods with more single-family rental units than in other neighborhoods.

{¶6} The Township also conducted a study regarding the impact of rental units on property values in specific neighborhoods and compared them to township-wide and county-wide property values. The result of the study revealed that there was a greater than 10% disparity in the decline of property values in the neighborhoods with high duplex/multi-family units compared to the decline throughout Boardman Township and Mahoning County.

{¶7} First, the Township began rezoning thousands of residential parcels from R-2, which allows duplexes or multi-family units, to R-1, which only allows single family homes. Second, the Township adopted the Resolution to enact a landlord registration program and establish rental unit standards in order to protect the property values of the rental units, the adjacent properties and the entire neighborhood. The Township deemed this to be necessary for the general health, safety and welfare of the general public. The Township further believed staff would be successful in addressing violations by maintaining updated contact information for landlords or their property managers, which would be obtained through the application and certification process.

{¶8} The Resolution requires the owner to obtain an annual rental unit certification. An annual fee is set based upon the number of units owned to correspond with the actual time spent on each parcel. For example, an owner of a single rental duplex would pay $40 per unit, whereas an owner of an apartment building with more than six rental units would pay $150 plus $15 for each unit. Further, the fee is set to not exceed the Township's anticipated actual costs to

administer the program, coverring nearly 5,000 rental unit owners. Anticipated costs include distribution and processing the annual applications, conducting inspections pursuant to complaints, filing abatement and enforcement actions and paying associated attorney fees. To that end, the Township will review the fees after the first three years of the program and every five years thereafter. The proceeds generated by the annual fees are to be deposited into a restricted fund established by the Township; the sole purpose of which is to pay the expenses and costs related to the program.

{¶9} The Resolution sets minimum standards for residential units. It also imposes separate, specific obligations upon the owner-landlord and occupant-tenant so that the interior of the unit ultimately remains in a safe and sanitary condition. Both owners and occupants can be cited for violations. Regarding enforcement, the Resolution sets a fine structure. Regarding inspections, the program is complaint based and authorizes the zoning inspector to enter a unit at a reasonable time if the occupant grants permission. If permission is not or otherwise cannot be obtained, the Resolution authorizes the Township to apply for an administrative search warrant.

{¶10} The trial court first noted that as a matter of law Ohio courts recognize the distinction between owner occupied versus rented residential property, the latter requiring greater health and safety regulation, and the governmental interest in protecting the community from unsafe housing is more critical with rental property. The trial court found Hiznay failed to demonstrate by clear and convincing evidence that the Resolution does not bear a real and substantial relation to the public health, safety, morals or general welfare of the public, and that the Township presented evidence demonstrating the Resolution was not arbitrarily enacted. Accordingly, the trial court concluded that the Resolution was a proper exercise of the Township's police power, and entered judgment in favor of the Township. For clarity of analysis we will address Hiznay's assignments of error out of order.

**Building Standards**

**{¶11}** In his second of three assignments of error, Hiznay asserts:

The trial court erred as a matter of law by finding that Boardman Township did not adopt impermissible building standards.

**{¶12}** "In Ohio, 'townships are creatures of the law and have only such authority as is conferred on them by law.'" *Drees Co. v. Hamilton Twp*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, ¶ 13. Pursuant to Revised Code Chapter 504, Boardman Township is a limited home rule township and may

(A)(1) Exercise all powers of local self-government within the unincorporated area of the township, other than powers that are in conflict with general laws * * *

(2) Adopt and enforce within the unincorporated area of the township local police, sanitary, and other similar regulations that are not in conflict with general laws or otherwise prohibited by division (B) of this section

* * *

(B) No resolution adopted pursuant to this chapter shall do any of the following:

* * *

(4) Establish or revise building standards, building codes, and other standard codes except as provided in section 504.13 of the Revised Code[.]

R.C. 504.04

**{¶13}** Hiznay argues that the Township, through its resolution, is attempting to create or modify building standards which is something specifically prohibited pursuant to R.C. 504.13. In the trial court proceedings, Hiznay conceded the Township did not create a building code by enacting the Resolution, but rather creates impermissible building maintenance standards. On appeal, Hiznay argues

that since the county has adopted building codes for plumbing, electrical, heating, and cooling systems, the Township is prohibited from adopting the resolution in question because it attempts to regulate those same subjects.

**{¶14}** The Resolution does not establish a building code but instead sets property maintenance standards. As the trial court aptly pointed out, the Resolution merely requires rental properties to be maintained, which removes it from the realm of building codes; property maintenance codes are substantively different from building codes. See *Village of Ottawa Hills v. Boice*, 6th Dist. No. L-12-1301, 2014-Ohio-1992. The trial court correctly determined that the Resolution does not regulate any of the areas prohibited by R.C. 504.13. Further, as Hiznay makes this assertion without offering any county codes or standards into evidence we are unable to determine whether an actual conflict exists. Accordingly, Hiznay's second assignment of error is meritless.

### Conflict with General Laws

**{¶15}** In his third of three assignments of error, Hiznay asserts:

> The trial court erred as a matter of law by failing to find that Boardman Township's rental property registration program is in conflict with the general laws of the State of Ohio.

**{¶16}** The trial court considered alleged conflicts between the Resolution and three Revised Code Chapters: Chapter 4112, containing Ohio's civil rights statutes; Chapter 5321, Ohio's Landlord-Tenant Act; and Chapter 5323, which sets forth statutes governing Owner Information Requirements for Residential Rental Property. The Township additionally contends that Hiznay argues the Resolution conflicts with Chapter 1923, Ohio's forcible entry and detainer statute. Each will be discussed in turn.

**{¶17}** First, regarding Chapter 4112, the trial court concluded, "[t]here is no merit to this argument, as HR-01 does not interfere with the anti-discrimination practices outlined therein." Second, the trial court held that there was no conflict

between the Resolution and Chapter 5323. However, after referencing both of these statutory chapters in his brief, Hiznay makes no further legal argument regarding either. This Court cannot create an argument for an appellant as that would be inherently unjust to the other parties. *Presidential Estate Condo Assn. v. Slabochova,* 7th Dist. No. 99-C.A-126, 2001 WL 315325, *2 (Mar. 28, 2001).

{¶18} Third, Hiznay argues that the Resolution conflicts with R.C. Chapter 5321 explicitly and implicitly. Regarding the alleged conflict by implication, the trial court found none. Regarding an explicit conflict, the trial court found one regarding the responsible party for trash receptacles. Hiznay contends that since there is a Revised Code Chapter dealing with landlord/tenant relations, the Township is precluded from addressing this area. The First District rejected a similar argument:

> The association relies upon R.C. 5321.19, which provides in part, "No municipal corporation may adopt or continue in existence any ordinance * * * that is in conflict with this chapter, or that regulates the rights and obligations of parties to a rental agreement that are regulated by this chapter." But the statute goes on to state, "This chapter does not preempt any housing, building, health or safety code * * *." The provisions of R.C. Chapter 5321 "are intended to be preventative and supplemental to other remedial measures." They do not limit a court's power and duty to enforce all applicable building, housing, health, and safety codes.

> State laws only preempt local ordinances to the extent that that are utterly inconsistent with local law, or when the legislature has expressed a clear intention to override local law. The ordinance in this case is consistent with R.C. Chapter 5321, and therefore it is not preempted. Consequently, we overrule the association's first assignment of error.

*Mariemont Apartment Assn. v. Village of Mariemont*, 1st Dist. No. C-050986, 2007-Ohio-173, ¶ 12-13.

**{¶19}** The same rationale applies here. The Resolution was not utterly inconsistent with Chapter 5321 except for R.C. 5321.04(A)(5) regarding trash receptacles which the trial court severed from the Resolution.

**{¶20}** Finally, R.C. Chapter 1923 was not mentioned or analyzed by the trial court. Generally, errors not raised in the trial court cannot be raised for the first time on appeal. *State v. Carroll*, 7th Dist. No. 95–C–9, 1996 WL 331113, *3 (June 13, 1996). However, an appellate court may still review the record for plain error. *State v. Ferrara*, 7th Dist. No. 14 MA 4, 2015–Ohio–3822, ¶ 23. Again, Hiznay makes no further legal argument on appeal beyond referencing Chapter 1923. Thus we need not address this issue. *Presidential Estate Condo Assn*.

**Tax versus Fee**

**{¶21}** In his first and final of three assignments of error, Hiznay asserts:

The trial court erred as a matter of law by finding the assessment charged by Boardman Township was a permissible fee and not an illegal tax.

**{¶22}** There is no bright-line rule that distinguishes a tax from a fee, and each case must be analyzed individually based on its own unique facts and circumstances. *State, ex rel. Petroleum Underground Storage Tank Release Comp. Bd. v. Withrow*, 62 Ohio St.3d 111, 115, 579 N.E.2d 705 (1991). Both parties agree that *Drees Co. v. Hamilton Twp.*, supra, is the controlling precedent. However, they disagree as to the ultimate conclusion after applying the law to the facts of the present matter. Hiznay argues that the rental fees imposed by the Township are an impermissible tax. The Township acknowledges that it does not have the statutory authority to enact a tax, but asserts townships are empowered to charge fees in return for a service provided by the township.

**{¶23}** In *Drees*, Hamilton Township imposed fees upon applicants for zoning

certificates for new construction or redevelopment within the township's unincorporated areas. Id. ¶ 3. The resolution included four fees: a road-impact fee, a fire-protection-impact fee, a police-protection-impact fee, and a park-impact fee. *Id.* The Ohio Supreme Court analyzed factors from two cases in reaching their holding that the fees imposed by Hamilton Township were an improper tax not authorized by general law. *Id.* ¶ 1.

**{¶24}** The *Drees* Court stressed that a reviewing court must analyze the substance of the assessments and not just their form. *Id.* ¶ 15. In doing so the Court applied four factors from *Withrow,* where the Ohio Supreme Court held that the assessments collected from owners and operators of underground storage tanks constituted a fee rather than tax, and thus could be used to pay principal and interest on revenue bonds issued to capitalize funds established by the state to assure cleanup of underground storage tank leaks. *Withrow*, 116-117.

**{¶25}** The four *Withrow* factors to apply when resolving whether the assessment is a fee or a tax is to evaluate whether the assessment: 1) was imposed to further regulatory measures to address a specified issue; 2) was used only for the narrow and specified purpose and not placed in the general fund; 3) was imposed by a government in return for a service it provides; and 4) was calculated and adjusted so that the amount of funds generated were in an amount sufficient to cover the expenses. *Drees,* ¶17-20; citing *Withrow*, at 113, 116-117.

**{¶26}** First, the *Drees* Court found it significant that the fees imposed in *Withrow* furthered regulatory measures designed to address environmental problems caused by leaking underground storage tanks. The fees paid by the owners and operators of the underground tanks went into a separate fund that assisted these individuals in paying for corrective actions and damages. *Drees*, ¶ 17.

**{¶27}** Second, the *Withrow* Court looked to see where the fees were deposited: the general fund versus a specific fund. The assessments in *Withrow* were never placed in the general fund and were to be used only "for narrow and specific purposes, all directly related to UST problems." *Withrow*, 116-117.

**{¶28}** Third, in *Withrow* the Court concluded that a service was provided in exchange for the fee, noting that "[a] fee is a charge imposed by a government in return for a service it provides." *Id.* at 113. In exchange for the fee in *Withrow*, the underground tank owners and operators received protection that resembled insurance.

**{¶29}** Lastly, the *Withrow* Court was persuaded by the fact that when the unobligated balance in the fund exceeded a certain amount, there would be no assessment for that year. Further, if the fund dipped below a certain amount, the assessing authority was permitted to charge a supplemental assessment. "Thus, the assessment appears to function more as a fee than as a tax, because a specific charge in return for a service is involved." *Withrow,* 117.

**{¶30}** The *Drees* Court also reviewed *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgt. Dist.*, 166 F.3d 835 (6th Cir.1999), *Bidart Bros. v. California Apple Comm.*, 73 F.3d 925 (9th Cir.1996), and *San Juan Cellular Tel. Co. v. Pub. Serv. Comm. Of Puerto Rico,* 967 F.2d 683 (1st Cir. 1992). The three-factor test discussed by these circuit courts was dubbed by the Ohio Supreme Court as the *Am. Landfill* analysis; and when evaluating whether an assessment is a fee or tax, a court should consider: "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Drees*, ¶27 (internal citations omitted.) The *Drees* Court elaborated:

The court in *San Juan* described the classic versions of a tax and a fee:

The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. * * * The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. * * * It may serve

> regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. * * * Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*San Juan* at 685.

In regard to the first two factors—the entity that imposes the assessment and the entity that must pay the assessment—"[a]n assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency" and "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Bidart,* 73 F.3d at 931, citing *San Juan*, 967 F.2d at 685.

Most assessments fall somewhere near the middle of the spectrum between a fee and a tax; in such cases, the use of the funds becomes the predominant factor in making the ultimate determination:

> Both *San Juan* and *Bidart* indicate that for cases where the assessment falls near the middle of the spectrum between a regulatory fee and a classic tax, the predominant factor is the revenue's ultimate use. See *San Juan*, 967 F.2d at 685; *Bidart*, 73 F.3d at 932. When the ultimate use is to provide a general public benefit, the assessment is likely a tax, while an assessment that provides a more narrow benefit to the regulated companies is likely a fee. See *id.*

*Am. Landfill,* 166 F.3d at 837–838.

*Drees*, ¶ 28-30.

**{¶31}** The *Drees* Court analyzed the use of the funds generated by the impact fees in that case, concluding:

> Here, the assessment results in no direct service to the landowner, other than the issuance of a zoning certificate, for which there is already a separate $200 fee. When the amount of the fee exceeds the cost and expense of the service, the fee constitutes a tax. *Granzow v. Montgomery Cty. Bur. of Support*, 54 Ohio St.3d 35, 38, 560 N.E.2d 1307 (1990). The impact fees are a revenue-generating measure designed to support infrastructure improvements benefiting the entire township. "Taxation refers to those general burdens imposed for the purpose of supporting the government, and more especially the method of providing the revenues which are expended for the equal benefit of all the people." *Cincinnati v. Roettinger*, 105 Ohio St. 145, 153–154, 137 N.E. 6 (1922).

*Drees*, ¶ 40.

**{¶32}** After analyzing the substance of the assessments, the *Drees* Court concluded that the impact fees charged by Hamilton Township constituted taxes, and since those taxes were not authorized by general law, the township was not authorized to impose them pursuant to R.C. 504.04(A)(1).

**{¶33}** We now turn to applying the *Withrow* and *Am.Landfill* factors to this appeal to determine whether the Resolution imposed a fee or a tax.

**{¶34}** Regarding the first *Withrow* factor—whether the assessment was imposed to further regulatory measures to address a specified issue—this weighs in favor of a fee. Albeit not a fee as definitively as in *Withrow*, nonetheless this factor does not weigh heavily in favor of a tax as in *Drees*. The Township was facing the problem of aging, depreciated properties that once were owner occupied, but have since been converted to rental properties. The problem was compounded by 40% of

the owners of residential rental properties living outside the Township, and officials lacking contact information in order to correct unsafe/unsanitary conditions before properties needed to be condemned.

**{¶35}** To address these problems, the Resolution set up a mechanism to obtain and annually maintain current contact information for owner-landlords. The Resolution additionally sets minimum maintenance standards for residential units and imposes separate, specific, detailed obligations upon the owner-landlord and occupant-tenant; particularly focusing on the interior of the unit, so that it ultimately remains in a safe and sanitary condition. Both owners and occupants can be cited for violations. The Resolution creates a program to reduce the accelerated rate of property value depreciation of this segment of the Township's housing market, which has had a documented negative impact on the value of those rental properties, adjacent properties and the local neighborhood, when contrasted with the Township as a whole and the county.

**{¶36}** The second *Withrow* factor—whether the assessment will be used only for the narrow and specified purpose and not placed in the general fund—weighs in favor of a fee. The fee is assessed to finance the extra costs of creating and maintaining annually thereafter a list of all residential rental property owners—which involve 4,000-5,000 units—as well as managing all complaints, especially interior violations in this segment of the Township housing market. Finally, the fees are maintained in a separate account to pay the costs, for example, of condemnation and attendant attorney fees; they are not included in the Township's general fund.

**{¶37}** The third *Withrow* factor—whether the assessment was imposed by a government in return for a service it provides—weighs in the middle of the fee or tax spectrum. These are services provided by the Township for a particular property owner demographic to address issues unique to residential rentals, and to ultimately preserve those property values to the benefit of the owners.

**{¶38}** At first blush the services outlined in the Resolution may appear to be services typically provided as in *Drees.* However, the assessment in *Drees* was for

government services provided to all residents; there were no special, separate or additional services provided to those paying the impact fees. Conversely, this case involves two distinct types of residential property: owner occupied versus rental. The latter requires greater health and safety regulation and the governmental interest in protecting the community from unsafe housing is more critical with rental property. As such the requirements of the Resolution fall within the Township's police powers. The assessment provides the Township with the additional financial resources to enforce the maintenance requirements being adopted and to do so in order to reduce complaints, the majority of which were in neighborhoods with more single-family rental units than elsewhere in the Township, which also have a 10% disparate decrease in property values. Thus, this factor tends towards the fee end of the spectrum when compared to the assessment permitted in *Withrow.*

{¶39} The fourth and final *Withrow* factor—whether the assessment is calculated and adjusted so that the funds generated were in an amount sufficient to cover the expenses—weighs in favor of a fee. Here, the fee was set to not exceed the Township's anticipated actual costs to administer the program. To that end, the Township would review the fees after the first three years of the program and every five years thereafter. This is akin to the facts in *Withrow*, which provided for an adjustment of the assessment in that case. Conversely, in *Drees*, there was no adjustment to the assessment.

{¶40} We next turn to the *Am. Landfill* factors, which somewhat overlap those from *Withrow,* and apply them to the assessment imposed by the Township's Resolution. The first factor is identifying the entity imposing the assessment, and here a township as opposed to a regulatory agency is imposing the assessment. Thus, this factor is more in the nature of a tax as contemplated by *Am. Landfill.*

{¶41} The second factor is ascertaining the parties who are being assessed. Here, the Township is imposing the assessment only upon the owners of residential rental units. Thus this factor is more in the nature of a fee as contemplated by *Am. Landfill.*

**{¶42}** The third and final factor is whether the assessment benefits the general public or the parties upon whom it is imposed, and here the answer is the latter. As contemplated in *San Juan,* the assessments are placed in a special fund to help defray the regulation-related expenses, including abatement or condemnation actions and the related attorney fees incurred by the Township. Finally, complaints under this Resolution program can only be made and enforced against residential rental units; they cannot be applied to, for example, owner-occupied residences or commercial property. Thus, on balance, the three *Am. Landfill* factors weigh in favor of a fee.

**{¶43}** Here, the stated purpose of the resolution was to "protect the integrity of our neighborhoods through the registration of landlords and establishment of rental unit standards, which is necessary for the general health, safety and welfare of the general public." Coupled with a majority of the *Withrow* and *American Landfill* factors, the assessment imposed by the Township is a fee. As a matter of law there is a distinction between owner occupied versus rented residential property, the latter requiring greater health and safety regulation, and the governmental interest in protecting the community from unsafe housing is more critical with rental property. Accordingly, for all these reasons, Hiznay's first assignment of error is meritless.

**{¶44}** In sum, Hiznay's three assignments of error are meritless as the Township's Resolution was proper. Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Waite, J., concurs.