[Cite as *White v. Cincinnati*, 2021-Ohio-4003.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| ANDREW WHITE, | : | APPEAL NO. C-210133<br>TRIAL NO. A-1804206 |
| VENA JONES-COX, | : | |
| CINCINNATUS PROPERTY<br>MANAGEMENT, LTD., | : | *O P I N I O N.* |
| | : | |
| TASHAZ, LLC, | : | |
| and | : | |
| | : | |
| PROFFITT REAL ESTATE SERVICES,<br>INC., | : | |
| Plaintiffs-Appellants, | : | |
| vs. | : | |
| CITY OF CINCINNATI, OHIO, | : | |
| and | : | |
| SONYA WALKER, in her official<br>capacity as Alarm Administrator<br>of the City of Cincinnati, Ohio,<br>and in her personal capacity, | : | |
| Defendants-Appellees. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  November 10, 2021

*1851 Center for Constitutional Law, Maurice A. Thompson, Finney Law Firm* and *Christopher Finney*, for Plaintiffs-Appellants,

*Andrew W. Garth*, City Solicitor, *Shuva J. Paul* and *Scott M. Heenan*, Assistant City Solicitors, for Defendants-Appellees.

**WINKLER, Judge**.

{¶1} Plaintiffs-appellants Andrew White, Vena Jones-Cox, Cincinnati Property Management, Ltd., Tashaz, LLC, and Proffitt Real Estate Services, Inc., filed a complaint in the Hamilton County Court of Common Pleas against defendants-appellees the city of Cincinnati and Sonya Walker, in her official capacity as Alarm Administrator for the city and in her personal capacity, (collectively "the city") challenging the constitutionality of the city's ordinances regulating alarm systems. The trial court denied appellants' motion for partial summary judgment and granted summary judgment in favor of the city. Appellants present three assignments of error for review. We find merit in their assignments of error, and we reverse the trial court's judgment.

### I. Facts and Procedure

{¶2} The record shows that in 1986, the city enacted Ordinance 448-1986 to regulate security alarm systems because of the high cost of responding to false alarms. That ordinance was codified in Cincinnati Municipal Code Chapter 807 ("Chapter 807"), which sets forth registration fees for "alarm businesses" and "alarm users."

{¶3} Cincinnati Municipal Code 807-1-A states that "alarm business" means "the business * * * of selling, installing, leasing, maintaining, servicing, repairing, altering, replacing, moving, or monitoring any alarm system or causing to be sold, installed, leased, maintained, serviced, repaired, replaced, moved, or monitored any alarm system in or on any building, structure or facility." Cincinnati Municipal Code 807-1-A3 defines an "alarm user" as "any person, firm, partnership, association,

corporation, company, or organization of any kind in control of premises wherein an alarm system is maintained."

{¶4} Cincinnati Municipal Code 807-1-A4 requires alarm businesses to register with the False Alarm Reduction Unit ("FARU") of the Cincinnati Police Department and provides penalties for failure to register. Alarm businesses must pay a registration fee of $250 annually. If an alarm business fails to register, the city imposes a $1000 civil penalty for each request for a police response related to an alarm system by an unregistered alarm business or for each request by an alarm user for registration of an alarm system installed by an unregistered alarm business.

{¶5} Alarm users must also register with FARU before an alarm system is activated. Residential alarm users must pay $50 every two years and nonresidential alarm users must pay $100 every two years. The city imposes a $100 civil penalty on an alarm user for using an unregistered alarm system, but the penalties may be waived if the alarm user completes registration within 21 days of the first notice of a violation. All fees imposed on both alarm businesses and alarm users are non-refundable, nontransferable, and location-specific.

{¶6} Cincinnati Municipal Code 807-11 sets forth penalties for repeated false alarms. After the first and second false alarm, FARU will issue a warning but not a penalty. After the third false alarm, it imposes a $50 fee which may be waived if the violator takes an educational class offered by the police. The fees continue to escalate for further false alarms to a maximum of $800 for each false alarm after the tenth.

{¶7} Appellants are alarm businesses and alarm users in the city. They alleged that Cincinnati Municipal Code 807-1-A4 violates their rights to free speech, to petition the government for redress, and to defend themselves and their property.

They also alleged that the regulatory scheme was an unconstitutional tax. They asked the trial court to declare that Cincinnati Municipal Code 807-1-A4 is unconstitutional on its face and as applied to them. They also asked for a preliminary and a permanent injunction prohibiting the city from enforcing it. Finally, they sought damages, including the return of fees they had already paid.

{¶8} The city filed a notice of removal of the case to federal court, and appellants filed a motion to remand to state court. A federal district court found that the regulatory assessments were a tax for purposes of the Tax Injunction Act, 28 U.S.C. 1341. The court stated that the act is jurisdictional and prevents federal courts from awarding declaratory or injunctive relief to plaintiffs who challenge state tax laws. Consequently, it granted appellants' motion to remand.

{¶9} Subsequently, appellants filed a motion for partial summary judgment on their claims for injunctive and declaratory relief. Among the documents they submitted in support of their motion was the affidavit of Kathleen Frye who, along with her husband, has operated a security alarm installation company for several years in numerous political subdivisions. Her business is classified as an "alarm business" under Chapter 807.

{¶10} Frye stated that her company adheres to industry standards. Those standards include: (1) notifying their clients' local police dispatcher to determine which phone number the police would like their agents to use for reporting notifications; (2) testing the security system and training the client on proper operation of his or her alarm system; (3) immediately calling the homeowner's primary phone number followed by a second number when it receives an alert; (4) calling the police only if the homeowner cannot be reached, or is reached and

5

indicates danger; and (5) notifying the police that an alarm has been triggered, that the homeowner cannot be reached, and any relevant surrounding circumstances.

{¶11} She stated that alarm-monitoring agents in the city are "live people," who place a phone call to the police. They do not call 911, but instead use the number the police have asked them to use. The agents cannot force the police to respond. They simply pass the information to the police, who decide how to respond.

{¶12} Frye further indicated that to her knowledge, only three other municipalities in southwest Ohio besides Cincinnati maintain any security-alarm-system regulations. The regulations of the other three municipalities are not as extensive or expensive as the city's, and only the city requires a registration fee. Further, the other municipalities penalize false alarms directly by imposing fines beginning with the third or fourth false alarm. They impose no fees for the first several false alarms.

{¶13} She said that her company must pay the annual registration fee to operate and that if all jurisdictions imposed an annual registration fee, "it would make it impossible for small local alarm businesses * * * to operate profitably and stay in business." Finally, she stated that based on her experience and expertise, "the alarm user registration fees do nothing to reduce the number of false alarms within a city, except for the possibility that those fees may cause fewer homeowners to install security alarms in the first place."

{¶14} The city filed a motion for summary judgment on all of appellants' claims. In support of its motion it submitted three affidavits. One was the affidavit of Chris Bingham who, at the time, was the city's budget director. He stated that the Cincinnati Police Department estimated that the city's response to alarm calls requires a minimum of eight full-time police officers annually, as well as an

estimated 20 percent in supervisory costs and other related costs. The estimated costs for 2015 through 2019 far exceeded the revenue from registration fees and penalties in those years.

{¶15} Bingham explained that although Chapter 807 sets the maximum dollar amounts that FARU may charge for registration fees and fines for false alarms, the actual dollar amounts are not determined by Cincinnati City Council, but by FARU staff on a case-by-case basis. Funds collected by FARU are deposited into the city's general fund. FARU staff uses appropriate account codes that are specific to FARU. He further stated that police and the Emergency Communications Center ("ECC") expenditures are funded for the most part by the general fund, and Chapter 807 revenue is deposited in the general fund to defray a portion of the costs associated with responding to and regulating alarm systems.

{¶16} The city also submitted the affidavit of Alice M. Hoctor, who is the Finance Division Manager for the Cincinnati Police Department. She also described the amount of costs the city incurs related to alarm systems and false alarms, which far exceed revenue. She indicated that FARU's collection efforts involved repeated notices and efforts to resolve outstanding amounts owed to the city by alarm users.

{¶17} Finally, the city presented the affidavit of Rachel L. Baldwin, who had been employed as a police officer by the Cincinnati Police Department for approximately 23 years. She described the impact of what the police refer to as "alarm drops," which are requests from ECC for an immediate police, fire or medical dispatch to premises where an alarm system on site has been activated. She stated that alarm drops are typically prompted by either an alarm company that monitors the alarm system, or by neighbors or passersby impacted by the sound produced by an activated alarm system. Regardless of who initiates the call, all alarm drops have

one thing in common, which is that the person or persons in control of the premises at the time of the alarm are not the ones requesting the dispatch, and they cannot be reached at the time the request for dispatch is made.

{¶18} She stated that alarm drops require a different police response than a 911 call from someone with personal knowledge of an emergency because the dispatcher is talking to an actual person who has actually witnessed the events that caused the 911 call. The dispatcher is able to elicit preliminary information before police officers arrive on the scene. The factual details can be conveyed to the responding officers so that they know the actual risk that awaits them at the scene.

{¶19} In the case of alarm drops, dispatchers can only convey limited information to the officers, and they must "go in blind." Consequently, they must take special precautions. Dispatchers must send two officers to respond to an alarm drop under Cincinnati police policy due to the great risk. Additionally, the amount of time it takes to respond to an alarm drop varies. If all windows and entry doors are locked, then the responding officers may be able to close out the incident in as little as five minutes. But if any entry doors or windows are compromised, then the response may take up to an hour or more, and additional officers may be requested to help secure the premises and provide additional safety. At nonresidential premises, the response can be complicated by employees on the scene.

{¶20} Officer Baldwin further stated that most alarms drops tend to be false alarms. Though the reasons for false alarms are many, the factor that unites all of them is that no one was present on the premises to speak with the dispatcher to alert the dispatcher that it was a false alarm. She described the burden placed on police by alarm drops as "great." Not only must two officers respond to what is likely to be a false alarm, those calls for services are typically given a high priority. Finally, she

indicated that the number of false alarms is under counted for a number of reasons, but often because the city works with property owners to try and minimize false alarms and the amount of fees whenever possible.

## II. Standard of Review

{¶21} An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996); *Chateau Estate Homes, LLC v. Fifth Third Bank*, 2017-Ohio-6985, 95 N.E.3d 693, ¶ 10 (1st Dist.). Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Chateau Estate Homes* at ¶ 10.

{¶22} The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of any genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 282-293, 662 N.E.2d 264 (1996); *Maas v. Maas*, 1st Dist. Hamilton No. C-190536, 2020-Ohio-5160, ¶ 14. Once the moving party has met its burden, the nonmoving party has a reciprocal burden to set forth specific evidentiary facts showing the existence of a genuine issue for trial. *Dresher* at 293; *Maas* at ¶ 14. The nonmoving party cannot rest on conclusory allegations or self-serving interpretations of the evidence presented. *Dresher* at 293; *Maas* at ¶ 14.

### III. Fees v. Taxes

{¶23} Appellants present three assignments of error for review. In their first assignment of error, appellants contend that the trial court erred in denying their motion for partial summary judgment. In their second assignment of error, appellants contend that the trial court erred in granting the city's motion for summary judgment. They argue that the court should have declared that the city's "prohibition on security alarm usage without prior payment of an arbitrary assessment is unconstitutional." These assignments of error are well taken.

{¶24} Appellants argue that the assessments set forth in Cincinnati Municipal Code 807-1-A4 are unconstitutional taxes and not fees. *See* Ohio Constitution, Article XII. The Supreme Court of Ohio has acknowledged that there is no bright-line rule that distinguishes a tax from a fee. *State ex rel. Petroleum Underground Storage Tank Release Comp. Bd. v. Withrow*, 62 Ohio St.3d 111, 117, 579 N.E.2d 705 (1991). "It is not possible to come up with a single test that will correctly distinguish a tax from a fee in all situations * * *." *Id.* Therefore, "[d]etermining whether an assessment is a fee or a tax must be done on a case-by-case basis dependent upon the facts and circumstances surrounding each assessment." *Id.* at 115.

{¶25} Although no single test exists for making the determination whether a given assessment is a permissible fee versus an illegal tax, the Ohio Supreme Court has provided guidance on this issue. In *Drees Co. v. Hamilton Twp.*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, the court expanded upon its earlier decision in *Withrow* and set forth four factors that tend to indicate that an assessment is a fee: (1) the assessment is "imposed in furtherance of regulatory measures to address a specified issue"; (2) the assessment is not placed in the general fund, but is used

only to fund the specified purpose; (3) the assessment is "imposed by a government in return for a service it provides"; and (4) the assessment involves "a specific charge in return for a service * * *." *Steeplechase Village, Ltd. v. Columbus*, 10th Dist. Franklin No. 19AP-736, 2020-Ohio-7012, ¶ 40, citing *Drees* at ¶ 16-20.

{**¶26**} The *Drees* court also applied the three-factor analysis employed by the Sixth Circuit Court of Appeals in *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgt. Dist.*, 166 F.3d 835 (6th Cir.1999). This analysis is similar to that used in *Withrow*. *Drees* at ¶ 26. Under this analysis, in determining whether an assessment is a tax or a fee, a court should consider: "(1) the entity that imposes the assessment; (2) the parties upon whom the assessment is imposed; and (3) whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Id.* at ¶ 27, quoting *Bidart Bros. v. California Apple Comm.*, 73 F.3d 925, 931 (9th Cir.1996).

{**¶27**} In *Drees*, the court explained the classic distinction between a tax and a fee,

> The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. * * * The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. * * * It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. * * * Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

*Drees* at ¶ 28, quoting *San Juan Cellular Tel. Co. v. Pub. Serv. Comm. of Puerto Rico*, 967 F.2d 683, 685 (1st Cir.1992). The *Drees* court further explained that with regard to the first two factors of the *Am. Landfill* analysis, "[a]n assessment imposed directly by the legislature is more likely to be a tax than an assessment imposed by an administrative agency" and "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Drees* at ¶ 29, quoting *Bidart Bros.* at 931.

{¶28} In *Drees*, the court acknowledged that "[m]ost assessments fall somewhere near the middle of the spectrum between a fee and a tax," and in those cases, the use of the funds is the predominant factor in making the ultimate determination. *Drees*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, at ¶ 30. "When the ultimate use is to provide a general public benefit, the assessment is likely a tax, while an assessment that provides a more narrow benefit to the regulated [parties] is likely a fee." *Id.*, quoting *Am. Landfill* at 837-838.

## A. Withrow Factors

{¶29} We begin our analysis by looking at the *Withrow* factors. The first factor is whether the assessment was imposed to further regulatory measures to address a specified issue. The preamble to Ordinance 448-1986 states that "the generation of false alarms in the city of Cincinnati exceeds 95% of alarm responses by police," that "there is a significant cost to the city in responding to false alarms," and that "there is a need to conserve the emergency response capability of the Cincinnati Police Division * * *." The fees imposed on alarm owners are to discourage issues that result in false alarms by making it more expensive. Because the ordinance was enacted to address the costs of false alarms, this factor weighs in

favor of a fee. *See Steeplechase Village,* 10th Dist. Franklin No. 19AP-736, 2020-Ohio-7012, at ¶ 44; *Hiznay v. Boardman Twp.*, 7th Dist. Mahoning No. 15 MA 0122, 2017-Ohio-1212, ¶ 34.

{¶30} The second factor is whether the assessment was used for only the narrow and specified purpose and not placed in the general fund. The funds from the alarm-system assessments are placed in the general fund, not in a fund specifically dedicated to paying for false alarms. But this fact is not dispositive. "We must examine the substance of the assessments and not merely their form." *Drees*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, at ¶ 22.

{¶31} The city argues that police and ECC expenditures are funded for the most part by the general fund. It says that revenue from the assessments "is deposited in the General Fund not to support all General Fund expenditures but rather, to defray a portion of the Police and Emergency Communications Center costs associated with and responding to and regulating alarm systems * * *." The revenue is placed in the general fund because that is "where the city's related costs come from." It further contends that the costs associated with responding to and regulating alarm systems exceeds the revenue received from the assessments.

{¶32} Nevertheless, nothing in Chapter 807 states that revenue from the assessments must be spent on costs related to alarm systems and false alarms. Thus, the funds can be spent in a general way on normal expenditures of government. Therefore, we find that this factor weighs in favor of a tax. *See Drees* at ¶ 22; *AE Owner, LLC v. Cleveland*, 8th Dist. Cuyahoga No. 107475, 2019-Ohio-2220, ¶ 9.

{¶33} The third factor is whether the assessment was imposed by a government in return for a service it provides. There are no services provided directly to the payers of the assessments that are not provided to all city residents.

The city discusses the costs and the problems associated with dispatching officers to the scene of an alarm, where the police have little knowledge of what was actually occurring at the scene. But, Chapter 807 does not obligate the city to respond to alarms in any specific way, it does not entitle alarm businesses and alarm users to any particular response from the city, or empower alarm businesses or users to enforce a right to any specific response from the city. There are no separate or additional services provided to those paying the fees. All taxpayers in the city are entitled to police protection. *See Drees,* 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, at ¶ 23; *AE Owner* at ¶ 9. Consequently, this factor weighs in favor of a tax.

{¶34} The fourth *Withrow* factor is whether the assessment was calculated and adjusted so that the funds generated were in an amount sufficient to cover the expenses. Here the city acknowledges that revenue from the assessments is insufficient to cover the expenses generated by false alarms, but it contends that they are an attempt to recoup some of those costs. Unless the fees charged are "unreasonable or designed to bring in revenue more than sufficient" to cover the costs of providing police service to alarm users, "it cannot be said that such fees in effect amount to taxes." *State ex rel. Gordon v. Rhodes*, 158 Ohio St. 129, 134, 107 N.E.2d 206 (1952). Nevertheless, there is no provision in Chapter 807 providing that if the revenue from the amount of fees exceeds the costs, the excess must be used for purposes related to false alarms. *See Drees* at ¶ 24 and 29; *Gordan* at 134; *Hiznay*, 7th Dist. Mahoning No. 15 MA 0122, 2017-Ohio-1212, at ¶ 39.

{¶35} Chapter 807 is a hybrid of sorts. The annual assessments are not tied to a specific act that the city seeks to discourage, which weighs in favor of a tax. But

the ordinances also impose fines for false alarms, which weighs in favor of a fee. Consequently, we find that the fourth factor is neutral.

### *B. Am. Landfill Factors*

{¶36} The *Am. Landfill* factors overlap the *Withrow* factors to some extent. *Hiznay* at ¶ 40. Under the first factor, a court should consider the entity that imposes the assessment. The city argues that while the ordinance sets forth the maximum dollar amounts that may be charged, FARU actually determines the fees on a case-by-case basis. FARU works with property owners to minimize the owner's exposure to fines for false alarms. But FARU is an arm of the city, and the fees are ultimately imposed by city council, which is a legislative body. Therefore, this factor weighs in favor of a tax. *See Drees,* 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, at ¶ 31; *Steeplechase Vill*age, 10th Dist. Franklin No. 19AP-736, 2020-Ohio-7012, at ¶ 48; *Hiznay* at ¶ 40.

{¶37} The second factor a court should consider is the parties on whom the assessment is imposed. The assessment is imposed on "alarm businesses" and "alarm users" as defined in Chapter 807. Thus, the assessment is imposed on a narrow class rather than taxpayers in general, and this factor weighs in favor of a fee. *See Steeplechase Village* at ¶ 48; *Hiznay*, 7th Dist. Mahoning No. 15 MA 0122, 2017-Ohio-1212 at ¶ 41.

{¶38} Finally, the third factor a court should consider is whether the assessment is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed. Although the city contends that the revenue from the assessments is to defray some of the costs from false alarms, the fact that it is put in the general fund and could be used for any

expenditure cannot be ignored. *See AE Owner*, 8th Dist. Cuyahoga No. 107475, 2019-Ohio-2220, at ¶ 9.

**{¶39}** The community generally will benefit from the increased police protection through the reduction of costs due to false alarms. Further, appellants, like other taxpayers, pay for police protection through their tax dollars. Imposing a separate fee or penalty constitutes a form of double taxation. *See Kubicki v. N. Royalton*, 139 Ohio App.3d 127, 132, 743 N.E.2d 411 (8th Dist.). Thus, the third factor places the assessments "solidly in the realm of taxation." *Drees*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, at ¶ 32. *See Gordon*, 158 Ohio St. at 134, 107 N.E.2d 206 (revenues from on-street parking were used for furnishing necessary parking facilities); *Steeplechase Village*, 10th Dist. Franklin No. 19AP-736, 2020-Ohio-7012, at ¶ 46 (storm water service charges used only for the maintenance, repair and operation of the storm water system); *Hiznay* at ¶ 42 (assessments from a rental-property registration program placed in a special fund to help defray the regulation-related expenses).

**{¶40}** Although the federal district court's decision remanding the case to the state court is not binding on this court, it is persuasive. In regard to the third factor, it stated, "[R]esidents or non-residents are not receiving a service for the payment of the registration fee. The City does not respond any differently to a call from an alarm system than it does to a call made directly to the fire or police department. Therefore, * * * the City's alarm registration fee is based solely on status instead of the use of any city service." *White v. Cincinnati*, S.D.Ohio No. 1:18cv533 (Mar. 22, 2019).

**{¶41}** Applying the *Withrow* and *Am. Landfill* factors, we find that four factors weigh in favor of a tax, two in favor of a fee, and one is neutral. Given that the

use of the funds is the predominant factor to consider, we hold that the assessments, which are currently posted in the general fund, fall into the category of a tax.

### IV. Constitutionality of the Tax

**{¶42}** Because we have determined that the assessments imposed by Cincinnati Municipal Code 807-1-A4 are taxes rather than fees, we must now determine the constitutionality of those taxes. Article XVIII, Section 3 of the Ohio Constitution, known as the Home Rule Amendment, grants municipalities the authority to "exercise all powers of local self-government." *Put-in-Bay v. Mathys*, 163 Ohio St.3d 1, 2020-Ohio-4421, 167 N.E.3d 922, ¶ 12; *Time Warner Cable, Inc. v. Cincinnati*, 2020-Ohio-4207, 157 N.E.3d 941, ¶ 7 (1st Dist.). Included in this broad grant of authority is the power to levy taxes. *Put-in-Bay* at ¶ 12; *Time Warner Cable* at ¶ 7. But that power is not absolute.

**{¶43}** The Due Process Clauses of the Ohio and the United States Constitutions impose limitations on a municipality's power of taxation. *Willacy v. Cleveland Bd. of Income Tax Rev.*, 159 Ohio St.3d 383, 2020-Ohio-314, 151 N.E.3d 561, ¶ 21. Whether a tax law violates due process depends on whether it bears some fiscal relation to the protections, opportunities, and benefits given by the entity imposing the tax. *Am. Refrigerator Transit Co. v. Glander*, 153 Ohio St. 191, 200, 91 N.E.2d 24 (1950); *Angell v. Toledo*, 153 Ohio St. 179, 185, 91 N.E.2d 250 (1950); *Vonkaenel v. Philadelphia*, 5th Dist. Tuscarawas No. 2000AP 04 0041, 2000 WL 81700, *3 (Jan. 23, 2001), all citing *Wisconsin v. J.C. Penny Co.*, 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267 (1940). In other words, has that entity "given anything for which it can ask return?" *See Granzow v. Bur. of Support of Montgomery Cty.*, 54 Ohio St.3d 35, 39, 560 N.E.2d 1307 (1990), quoting *J.C. Penny* at 444.

{¶44} As we have previously stated, the city does not provide the alarm businesses or the alarm users with any services over and above what it already provides for taxpayers in general. Chapter 807 does not entitle alarm business and alarm users to any particular response from the city or give them the right to any particular response. The city has not given anything to them for which it can ask for the assessments in return. The assessments, particularly the registration fees, do not bear a reasonable relationship to protections, benefits or opportunities provided by the city to those paying the assessments. *See Granzow* at 39; *AE Owner*, 8th Dist. Cuyahoga No. 107475, 2019-Ohio-2220, at ¶ 8; *Richmond Hts. v. LoConti*, 19 Ohio App.2d 100, 108-109, 250 N.E.2d 84 (8th Dist.1969).

{¶45} Based on this analysis, we hold that the assessments imposed by Cincinnati Municipal Code 807-1-A4 violate the Due Process Clauses of the Ohio and United States Constitutions. We do not hold that the city is prohibited from amending the current ordinance or passing another ordinance regulating alarm systems and false alarms. If it is so inclined, the city must do so in a manner that assures that the assessments constitute a fee rather than a tax.

{¶46} We find no issues of material fact. Construing the evidence most strongly in the city's favor, we find that reasonable minds can come to but one conclusion–that the assessments are a tax and the imposition of that tax is unconstitutional. Therefore, appellants are entitled to judgment as a matter of law. Because the tax issue is dispositive, we decline to address appellants' other constitutional issues. *See State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9; *State v. Stumph*, 1st Dist. Hamilton No. C-190318, 2021-Ohio-723, ¶ 39.

## *V. Summary*

{¶47}  We sustain appellants' first two assignments of error.  We reverse the trial court's judgment granting summary judgment in favor of the city.  We remand the matter to the trial court for the court to grant an injunction enjoining the city from imposing the alarm assessments under Cincinnati Municipal Code 807-1-A4 and to determine damages, if any.

{¶48}  In their third assignment of error, appellants contend that the trial court erred in finding that their motion for class certification is moot.  Based on our disposition of the first two assignments of error, we find this assignment of error to be well taken.  Consequently, we sustain appellants' third assignment of error and remand the cause to the trial court to determine the merits of appellants' motion for class certification.

Judgment reversed and cause remanded.

**BOCK, J.,** concurs.
**ZAYAS, P.J.**, concurs separately.

**ZAYAS, P.J.,** concurring separately.

{¶49}  I concur with the majority's opinion.  I write separately only to add to the majority's note that our holding does not prohibit the city from amending the current ordinance or passing another ordinance regulating alarm systems and false alarms if they do so in a manner where the assessments would constitute a fee rather than a tax.  I caution that, if the city does choose to do so, the ordinance must also not interfere with private rights beyond the necessities of the situation and must not be unreasonable or arbitrary.

{¶50} To be a valid exercise of a city's police powers, an ordinance " 'must directly promote the general health, safety, welfare or morals and must be reasonable, the means adopted to accomplish the legislative purpose must be suitable to the end in view, must be impartial in operation, must have a real and substantial relation to such purpose and must not interfere with private rights beyond the necessities of the situation.' " *Hausman v. Dayton*, 73 Ohio St.3d 671, 678, 653 N.E.2d 1190 (1995), citing *Teegardin v. Foley*, 166 Ohio St. 449, 143 N.E.2d 824 (1957), paragraph one of the syllabus. "Essentially, to avoid violating due process, legislative action must bear a real and substantial relation to public health and welfare, and not be unreasonable or arbitrary." *Id.*, citing *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 503 N.E.2d 717 (1986). Private rights must not be arbitrarily or unreasonably infringed. *See Dragelevich v. City of Youngstown*, 176 Ohio St. 23, 30, 197 N.E.2d 334 (1964).

{¶51} Among the most blaring of problems with the assessments set forth in Cincinnati Municipal Code 807-1-A4 is that users of "local alarm systems"—that do *not* contact the police or any government organization—are required to register and follow the provisions of Cincinnati Municipal Code 807-1-A4 in the same manner as other alarm users whose alarm systems do contact the police. Interestingly, when Ordinance 448-1986—codified in Cincinnati Municipal Code Chapter 807—was enacted in 1986, it did not require registration, nor the biennial "fee," and the definition of an "alarm system" did not include local alarm systems. It solely imposed fees on an individual user "based on the number of false alarms sent by one alarm system within any calendar year." What was the reason for these new requirements? What are the true benefits that come from these new requirements? Do the new requirements have a real and substantial relation to the original purpose

of the ordinance? Instead of promoting the public health and welfare, the assessments, as currently written, may have a chilling effect in that it deters citizens from utilizing alarm systems to protect themselves, their homes, and their property.

Please note:

The court has recorded its own entry on the date of the release of this opinion.