[Cite as *Bruemmer v. Gilligan*, 2024-Ohio-6039.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| MATTHEW D. BRUEMMER, | : | APPEAL NOS. C-240091 |
| | | C-240108 |
| Plaintiff-Appellant/Cross-Appellee, | : | TRIAL NO. A-2203467 |
| | : | |
| vs. | : | *O P I N I O N* |
| | : | |
| PAT GILLIGAN, | : | |
| and | : | |
| | : | |
| CHRIS ZIMMERMAN, | : | |
| | : | |
| Defendants-Appellees/Cross-Appellants. | : | |

Civil Appeals From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 27, 2024

*Finney Law Firm, LLC, Stephen E. Imm* and *Rebecca Simpson Heimlich*, for Plaintiff-Appellant/Cross-Appellee,

*Keating Muething & Klekamp PLL, William N. Minor, Amanda Brooke Burton, Collin L. Ryan* and *Carson E. Miller*, for Defendants-Appellees/Cross-Appellants.

**WINKLER, Judge.**

**{¶1}** Plaintiff-appellant/cross-appellee Matthew D. Bruemmer appeals the judgment of the Hamilton County Court of Common Pleas granting summary judgment in favor of defendants-appellees/cross-appellants Pat Gilligan and Chris Zimmerman (collectively "appellees") on his claims for breach of fiduciary duty and wrongful termination. In their cross-appeal, appellees argue that the trial court erred in dismissing their counterclaim for breach of contract. We hold that the trial court correctly granted summary judgment in favor of appellees on Bruemmer's claims, and that it did not err in dismissing appellees' counterclaim.

### Factual Background

**{¶2}** The record shows that Bruemmer was employed by Gilligan Company LLC, formerly known as Gilligan Oil Company LLC, from October 1993 to the date his employment was terminated in October 2021. Gilligan Company is a limited liability company that owns and operates approximately 100 stores, including GOCO, Popeyes, Gills Car Wash, Subway and Dunkin'. Gilligan was the president and chief executive officer, and Zimmerman was the chief operating officer.

**{¶3}** Throughout his tenure with the company, Bruemmer held several positions. In 2006, he was granted stock options because he was the most senior operations employee. At the time his employment was terminated, Bruemmer was a category manager. He was responsible for products at Gilligan Company's convenience stores. He maintained relationships with vendors and worked with the operations team to implement programs and plans for products in the stores.

**{¶4}** Bruemmer is Gilligan's brother-in-law, and according to appellees, he "was given a lot of leeway by people." Until late 2020 and early 2021, he was an "average" employee who "got the job done and didn't cause trouble" and who "was not

hurting [the] company." He was demoted from a supervisory position for not meeting expectations. Nevertheless, he continued to receive a salary that "was more than the salary grade for the job," although he did not receive any of the raises that were given to other employees. He was also given what he acknowledged was a "very favorable loan" in 2016 so that he could exercise his stock options before they expired because Gilligan wanted him to have money for retirement. That loan was paid back with the dividends paid out by the company.

{¶5} At the time his employment was terminated, Bruemmer held a 0.7 percent minority ownership in Gilligan Company and its real-estate arm, GOC Realco LLC. Gilligan held approximately 55 percent of the stock and Zimmerman held approximately 30 percent.

{¶6} For many years, Bruemmer worked with Jennifer Beaver, who was also a category manager, and considered her a friend. They were in charge of certain categories of products sold in Gilligan Company's convenience stores. Those duties included working with vendors to make sure products were delivered and stocked, handling the pricing and placement of products, administering vendor rebates, and assisting the store managers. Often, they had to travel to Gilligan Company's convenience stores on a moment's notice. Beaver was in charge of beer, wine and beverages. Bruemmer was responsible for all other products, which was substantially more than Beaver had to manage.

{¶7} In November 2020, Beaver was promoted to director of operations, a job Bruemmer said that he did not want because of the added responsibility. After her promotion, her position of category manager was not filled by anyone else. Bruemmer then became responsible for her product categories, which increased his workload by 50 percent, without any promotion or increase in pay. Beaver had tried to help him

by "streamlining the categories" and completing some of the tasks for him.

{¶8} Beaver became the company's first female supervisor, the most senior female employee, and Bruemmer's supervisor. According to appellees, his job performance declined significantly after that, and he "became a detriment to [the] business." He was "insubordinate" and "repeatedly disobeyed [Beaver's] orders, wouldn't connect [with] her from a job standpoint, and undermined her ability to run the business." He also missed meetings and failed to finish tasks.

{¶9} In particular, Bruemmer continuously failed to enter his weekly schedule (sometimes called "weekly structure"). In her new role, Beaver changed the method by which employees who reported to her were to enter their weekly schedule, which had previously been submitted by email. The employees were required to follow a link to special software online where they were to enter their schedules. These schedules were important for "team planning and objectives."

{¶10} In his deposition, Bruemmer acknowledged that he failed to enter his weekly schedule even though he had been told multiple times to do so. When asked how many times, he said, "There might have been a handful." He admitted that he did not do so, because he "didn't think it was important," even though both Beaver and Zimmerman had explained why it was important. Even when he entered his weekly schedule, he often failed to provide the required detail.

{¶11} According to Bruemmer, at the end of 2020, he was getting his schedule in on time. He claims that from the end of 2020 to when his employment was terminated, there were only a handful of instances where Beaver had any issues with his submission of his schedule. He claimed that each of those instances had mitigating circumstances, such as confusion as to the deadline by which his schedule had to be submitted and issues with the link to access the software.

4

{¶12} Additionally, on July 27, 2021, Bruemmer's wife became extremely ill while they were on vacation in Mexico. She was debilitated for several weeks. He notified Beaver of the situation and kept her updated on his wife's condition. Even though he had taken paid time off, he still fielded calls, assisted convenience stores, and tried to satisfy Beaver's "continuing questions, requests, and demands." As his wife's condition improved, he resumed working full time.

{¶13} Bruemmer failed to enter his schedule for the week of September 20, 2024. He claimed that he could not access the link. Beaver resent the link even though everyone else was able to enter their schedules, and Bruemmer still failed to enter his weekly schedule.

{¶14} When Bruemmer failed to enter his schedule the following week, Beaver decided to issue a formal employee warning notice, which was dated September 27, 2021. Under the heading of "description of violation or behavior needing improvement," it stated,

> Matt has been instructed on multiple occasions to plan out his weekly schedule and post it to the team weekly structure document. I have verbally warned Matt this this needs to be completed each week by noon Sunday. Matt has not entered a weekly schedule since 9/13/21, on Tuesday of last week 9/21 Matt said that he could not access the team structure, I replied to him telling [him] that everyone else was able to but I will send out the link again. I sent him that on 9/21/21.

It also said that the "Consequences of further violations" were "Disciplinary action upto/including termination."

{¶15} On September 29, 2021, Beaver asked Bruemmer to meet with her. She informed him about the formal written warning. He told her that she needed to "rip

5

it up and throw it away." She asked him to sign it, but he refused. When he was asked why in his deposition, he said that he felt the warning was "out of place," not because it was untrue, because it was "extreme for what the schedule actually was." He explained, "I mean, to be written up, I thought was a big deal, the schedule. I didn't see it as a big deal."

{¶16} After receiving the warning and leaving Beaver's office, Bruemmer went to Zimmerman's office. According to Zimmerman, he "threw the door open," and came in while Zimmerman was on the phone. Brummer was "visibly upset," and told Zimmerman he would not sign the warning and that he would quit before he signed it. Though he was upset, he did not yell or treat Zimmerman disrespectfully. Zimmerman was not aware that Beaver had given him a written warning. To help deescalate the situation, Zimmerman told Bruemmer he was suspended and to go home.

{¶17} Zimmerman went to Beaver, and she told him about the events that led to the written warning and about Bruemmer's disrespectful conduct toward her. He said, "her frustrations were that this was so silly over [him] just refusing to put his schedule in" and that it ended up with Bruemmer storming into Zimmerman's office. Zimmerman then spoke to Gilligan and told him that Bruemmer was being "disruptive" and that Gilligan needed to listen to Beaver.

{¶18} The next day Gilligan, Zimmerman and Beaver met to discuss the ongoing issues with Bruemmer's performance. She detailed numerous issues, the disruptions he was causing, and her repeated attempts to correct the problems, which she had been documenting for months. In addition to the issues related to his failure to provide his schedule, she detailed numerous incidents where he had failed to do assigned work, failed to attend meetings, and acted disrespectfully to his coworkers. After learning how Bruemmer was undermining Beaver's ability to do her job and

being a detriment to the business, Gilligan felt that he could not "protect [his] brother-in-law anymore." He decided to terminate Bruemmer's employment.

{¶19} The following day, Zimmerman met with Bruemmer to inform him that his employment was being terminated. The conversation was "[s]hort and straight to the point." Zimmerman told Bruemmer they were "going to have to let [him] go," and Bruemmer "stood up and left."

{¶20} Bruemmer gave a different version of the events. He said that up to the time in question, he had received good performance reviews. He had never received any written reprimands, warnings, or disciplinary notice for any aspect of his job performance, and he was never put on any kind of probation or performance improvement plan.

{¶21} According to Bruemmer, after Beaver asked him to sign the warning, he politely reminded her that he was having trouble with the software, assured her he would follow her instructions regarding the schedules in the future, and asked her to discard the warning. He noted that he and Beaver were friends, and that his request that she throw away the warning was in no way rude, disrespectful, or insubordinate. Beaver, he said, refused to accept his explanation and refused to discard the warning.

{¶22} Bruemmer chose not to sign the warning because he did not believe that it was fair or justified. He said he did not refuse to fill out his schedule or otherwise refuse to follow his supervisor's instructions. She wrote, "refused to sign" on the warning and then went into Zimmerman's office and gave it to him.

{¶23} After Beaver left Zimmerman's office, Bruemmer went in and politely discussed his conversation with Beaver. He told Zimmerman that he refused to sign the warning and explained why. Instead of just telling him that the warning would go in his file, Zimmerman suspended him and told him to go home. He added that he

was not present at the meeting between Gilligan, Zimmerman and Beaver, and he had no opportunity to defend himself. He believed that the company tried to justify the termination of employment after the fact, and he denied that many of the instances of misconduct reported by Beaver had occurred.

**{¶24}** Shortly after his termination, Bruemmer sold back his ownership interest for $562,451 under the terms of two buy-sell agreements with Gilligan Company and GOC Realco, which required him to do so upon termination of his employment. At the time of the sale, he executed two "Membership Redemption Agreements" for both companies, which contained general releases.

**{¶25}** Subsequently, Bruemmer filed his complaint asserting causes of action for breach of fiduciary duty and wrongful termination. Bruemmer later conceded that those claims are the same claim with different names. Appellees filed a counterclaim alleging that Bruemmer had breached the redemption agreements by filing suit and asserting that his claims were barred by the release set forth in those agreements.

**{¶26}** Appellees then filed a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief could be granted because Bruemmer had (1) already released all of his claims against appellees and agreed "never to file this lawsuit" against appellees, (2) agreed he could be terminated "for any reason whatsoever," and (3) agreed to indemnify appellees from any loss they might have incurred as a result. The trial court denied the motion.

**{¶27}** Subsequently, Bruemmer filed a Civ.R. 12(B)(6) motion to dismiss appellees' counterclaim. He argued that the redemption agreements on their face showed that they were only intended to govern the companies' buyout of his ownership interest in the companies. They did not govern his employment relationship with them. The trial court granted Bruemmer's motion and dismissed the counterclaim.

**{¶28}** Appellees filed a motion for summary judgment on Bruemmer's claims for breach of fiduciary duty and wrongful termination. The trial court granted the motion, finding that appellees had a legitimate business reason for firing Bruemmer. This appeal followed.

### *Breach of Fiduciary Duty*

**{¶29}** In his sole assignment of error, Bruemmer contends that the trial court erred in granting summary judgment in favor of appellees on his claims for breach of fiduciary duty and wrongful termination. He argues that genuine issues of material fact exist as to whether they had a legitimate business purpose for terminating his employment. This assignment of error is not well taken.

**{¶30}** An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996); *Blue Ash Auto Body, Inc. v. Frank*, 2022-Ohio-1292, ¶ 9 (1st Dist.). Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977); *Blue Ash Auto Body* at ¶ 9.

**{¶31}** The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of any genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996); *Maas v. Maas*, 2020-Ohio-5160, ¶ 14 (1st Dist.). Once the moving party has met its burden, the nonmoving party has a reciprocal burden to set forth specific evidentiary facts showing the existence of a genuine issue for trial. *Dresher* at 293; *Maas* at ¶ 14. The nonmoving party cannot

rest on conclusory allegations or self-serving interpretations of the evidence presented. *Dresher* at 293; *Maas* at ¶ 14.

**{¶32}** In a close corporation, majority shareholders owe a heightened fiduciary duty to minority shareholders to protect against abuse and oppression of minority shareholders. *Crosby v. Beam*, 47 Ohio St.3d 105, 108 (1989); *Maas*, 2020-Ohio-5160, at ¶ 70 (1st Dist.). When a minority shareholder is also an employee of a close corporation, the fiduciary duty provides additional protection to that minority shareholder. Majority shareholders may not terminate the employment of a minority shareholder without a legitimate business purpose. *Crosby* at 109; *Kirila v. Kirila Contrs., Inc.*, 2016-Ohio-5469, ¶ 33 (11th Dist.); *Thomas v. Fletcher*, 2006-Ohio-6685, ¶ 15 (3d Dist.).

**{¶33}** This rule does not immunize minority shareholders from termination of their employment. It "balances the need to protect the minority shareholder-employee with the needs of the close corporation in ridding itself of the unproductive or troublesome employee." *Gigax v. Repka*, 83 Ohio App.3d 615, 623 (2d Dist. 1992). In other words, the corporation has no duty to subjugate the corporation's interest to the employee's individual interest. *See Duggan v. Orthopaedic Inst. of Ohio, Inc.*, 365 F.Supp.2d 853, 864 (N.D. Ohio 2005).

**{¶34}** While the parties present different versions of what happened, particularly on the events of September 29, 2021, when Beaver presented Bruemmer with the formal written warning, those differences are largely irrelevant. The mere existence of factual disputes between the parties does not necessarily preclude summary judgment. Only disputes over genuine factual matters that affect the outcome of the suit will properly preclude summary judgment. Factual disputes that are irrelevant should not stop the entry of judgment as a matter of law. *Maas* at ¶ 15;

*Smith v. A. B. Bonded Locksmith, Inc.*, 143 Ohio App.3d 321, 326 (1st Dist. 2001).

**{¶35}** Bruemmer's employment was terminated because he failed to perform his job duties and to follow his supervisor's directions despite receiving multiple admonitions and opportunities to correct his performance issues. Bruemmer does not dispute that his employment was terminated for those reasons. He also acknowledged that Beaver and Zimmerman had discussed with him the need for him to provide his weekly schedule.

**{¶36}** In his deposition, Bruemmer admitted that he knowingly failed to enter his weekly schedule. He stated:

Q. This wasn't the first time you had failed to enter your weekly schedule, was it?

A. No.

Q. How many times do you think you didn't enter your weekly schedule?

A. There might have been a handful.

Q. And this is because you didn't think it was important?

A. Correct.

. . .

Q. So, Miss Beaver had instructed you to input your weekly schedule, and Mr. Zimmerman had instructed you to enter your weekly schedule, is that right?

A. Yes.

Q. And Mr. Zimmerman explained why it was important?

A. Yes.

Q. But you didn't think it was important?

A. Correct.

**{¶37}** In his deposition, he also stated that he felt that the warning was "out of place," but not because it was untrue. He felt that the warning was extreme. He explained that he thought that getting written up was "a big deal," and he said that he didn't see entering his schedule as a "big deal."

**{¶38}** The record shows that the purpose of having a "team schedule" was to streamline and organize team planning and objectives and "give the operations team an opportunity to seek out help from marketing, or from [Beaver], so that everyone knew what each team member was doing." Beaver needed the information in the team schedule to do her own schedule and plan her week before sharing the final weekly schedule with the team and her supervisor, Zimmerman. As the trial court stated, "This is clearly a legitimate business necessity to track performance, duties, and to share with coworkers what was deemed important."

**{¶39}** Further, the record shows that the termination of Bruemmer's employment was strictly a business decision. Bruemmer presented no evidence showing that appellees were engaging in a "squeeze out" or a "freeze out" to deprive him of the advantages or opportunities he was entitled to as a minority shareholder. *See Maas*, 2020-Ohio-5160, at ¶ 70 (1st Dist.). To the contrary, the record shows that Gilligan and Zimmerman, the majority shareholders, gave him more opportunities and advantages above and beyond those of a minority shareholder. Gilligan stated, "This was an employee who was demoted, who I gave a high salary to for all of his tenure, as you can see, with it never changing, gave him stock options that cost him zero, and gave him every ability to perform and to be a good employee."

**{¶40}** We find no material issues of fact. Reasonable minds can come to one conclusion—that the termination of Bruemmer's employment had a legitimate

business purpose. Appellees were entitled to a judgment as a matter of law. Consequently, the trial court did not err in granting appellee's motion for summary judgment, and we overrule Bruemmer's assignment of error.

### *Releases*

**{¶41}** In their sole assignment of error, appellees contend that the trial court erred in dismissing their counterclaim against Bruemmer for breaching the redemption agreements. They argue that under the terms of those agreements, Bruemmer was barred from filing this lawsuit. This assignment of error is not well taken.

**{¶42}** A Civ.R. 12(B)(6) motion to dismiss tests the sufficiency of the complaint. In ruling on such a motion, the trial court must take all the allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1988); *Maas*, 2020-Ohio-5160, at ¶ 68 (1st Dist.). A court may dismiss a complaint on a Civ.R. 12(B)(6) motion only when the plaintiff can prove no set of facts that would entitle the plaintiff to relief. *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242 (1975), syllabus; *Maas* at ¶ 68. The court should not rely on evidence outside of the pleadings, but it may consider materials that are referred to or incorporated into the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548 (1992); *Maas* at ¶ 68. We review the granting of a Civ.R. 12(B)(6) motion to dismiss de novo. *Maas* at ¶ 69.

**{¶43}** A release is a contract subject to all requirements for a valid contract. *Noroski v. Fallet*, 2 Ohio St.3d 77, 79 (1982); *Lassiter v. Lassiter*, 2002-Ohio-3136, ¶ 11 (1st Dist.). The interpretation of a written instrument is, in the first instance, a matter of law for the court. If it is clear and unambiguous, the court need not go beyond

the plain language of the agreement to determine the parties' rights and obligations. Instead, the court must give effect to the contractual language. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989); *Wal-Mart Realty Co. v. Tri-County Commons Associates, LLC*, 2017-Ohio-9280, ¶ 9 (1st Dist.). But if the provisions of a contract are ambiguous, an issue of fact exists for trial. *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322 (1984); *Walmart Realty Co.* at ¶ 9.

{¶44} A release of a cause of action for damages is an absolute bar to any claim encompassed within the release. *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 13 (1990); *Lassiter* at ¶ 11. Contract clauses that relieve a party from liability are not favored in the law and are to be strictly construed. *Whitson v. One Stop Tool & Party*, 2017-Ohio-418, ¶ 14 (12th Dist.); *Bader v. Ferri*, 2013-Ohio-3074, ¶ 28 (3d Dist.). They "are to be strictly construed against the drafter unless the language is clear and unequivocal." *Bader* at ¶ 28, quoting *Brown-Spurgeon v. Paul Davis Systems of Tri-State Area, Inc.*, 2013-Ohio-1845, ¶ 50 (12th Dist.).

{¶45} Nevertheless, courts routinely apply releases to bar future liability as long as the intent of the parties relating to exactly what kind of liability and who is being released are stated in clear and unambiguous terms. *Whitson* at ¶ 15; *Bader* at ¶ 29. "The pivotal inquiry is whether it is clear from the general terms of the entire contract, considered in light of what an ordinary prudent and knowledgeable party of the same class would understand," that the party benefiting from the release is relieved from liability. *Whitson* at ¶ 15, quoting *Swartzentruber v. Wee-K Corp.*, 117 Ohio App.3d 420, 424 (4th Dist. 1997).

{¶46} Bruemmer signed two identical buy-sell agreements with Gilligan Company and GOC Realco in 2016. Those agreements provide restrictions upon

shareholders', referred to as  Members', transfers of interest in the companies and sets forth provisions for the companies' redemption of a shareholder's interest in the companies.  They provide, "Upon the occurrence of a Triggering Event, the Company shall have the option to purchase all or any portion of the Member's Units at a purchase price equal to the Fair Market Value . . . ."  They defined a "Triggering Event" as "the death, Disability . . . , Bankruptcy . . . or termination of employment for any reason whatsoever of the Member."

**{¶47}** Under the terms of the buy-sell agreements, Bruemmer sold his minority ownership interest back to the companies after his employment was terminated.  The terms of the sale to both companies were governed by two identical membership-interest-redemption agreements dated December 15, 2021.  In those agreements Bruemmer was identified as "Holder."

**{¶48}** Section five of the membership-interest-redemption agreements provided,

> Holder agrees that it and its representatives, agents, estates, successors, heirs, and assigns (collectively, the "Releasors"), absolutely, irrevocably and unconditionally release and forever discharge Company and its past, present, and future affiliates . . . along with Company's and its affiliates' successors, heirs, assigns, representatives, estates, managers, directors, members, officers, employees, attorneys and/or agents (Company, its affiliates, and such other persons and entities, collectively the "Releasees"), both individually and in their official capacities, from any and all Actions (including direct and third party Actions), obligations, demands, complaints, contracts, liabilities, agreements, promises, debts, judgments and damages, whether existing or

contingent, known or unknown (collectively, "Claims"), which are against or involve, or may be brought against or may involve, any of the Releasees and that arise from or relate in any way to Holder's ownership of the Redeemed Units. Notwithstanding anything to the contrary herein, Holder and the Company acknowledge and agree that: (i) no Releasor has assigned any Claim being released hereunder; and (ii) the release under Section 5 shall not apply to any Claims or obligations of the Releasee pursuant to this Agreement. Holder further agrees on its behalf, and on its behalf, and on behalf of the other Releasors, never to institute any Action or proceeding of any kind against any Releasee by reason of or in connection to with any of the foregoing.

**{¶49}** In denying appellees' motion to dismiss the complaint and in granting Bruemmer's motion to dismiss the counterclaim, the trial court stated,

Strictly construing the release, the language specifically applies to claims that arise from or relate to Bruemmer's ownership interest in the Companies. Whether or not Bruemmer was properly terminated, the above cited agreements created an option for the Companies to buy out his ownership interest. The Companies opted to buy out Bruemmer, and the "Membership Interest Redemption Agreements" were written to accomplish that goal and no other. As Plaintiff argued, "Mr. Bruemmer is not claiming in this lawsuit that Defendants did anything wrong with regard to the purchase of his ownership interests. He is claiming that they did something wrong in terminating his employment" which contractually obligated him to sell his membership interest.

{¶50} We agree with the trial court's reasoning. Based on the plain and unambiguous language that the parties chose to employ, the redemption agreements only govern the terms under which the companies bought back Bruemmer's ownership interests. The agreements specifically provide, "Holder desires to sell all of the Redeemed Units to the Company, and the Company desires to redeem and otherwise purchase all of the Redeemed Units from Holder on the terms and conditions hereinafter set forth."

{¶51} The agreements do not contain any provisions governing the termination of Bruemmer's employment, and they do not address whether Bruemmer can bring a claim that his employment was unlawfully terminated. Under the plain language of the agreements, Bruemmer only agreed "never to institute any Action or Proceeding of any kind against any Releasee by reason of or in connection to any of the foregoing." The "foregoing" did not include any reference to Bruemmer's employment or employment-related claims.

{¶52} Strictly construing the language in the agreements, we hold that the releases contained in those agreements are intended only to govern Bruemmer's ownership interest in the companies and they do not apply to claims regarding Bruemmer's employment. Consequently, appellees can prove no set of facts that would entitle them to relief, and the trial court did not err in granting Bruemmer's motion to dismiss the counterclaim. We overrule appellees' assignment of error and affirm the trial court's judgment.

Judgment affirmed.

**BERGERON, P.J.,** and **CROUSE, J.,** concur.


Please note:

The court has recorded its entry on the date of the release of this opinion.